THOMAS v. DAUGHTERS OF UTAH PIONEERS et al.

No. 7130. Decided July 14, 1948. (197 P. 2d 477.)

Certiorari Denied by U. S. Supreme Court May 16, 1949.

112

See 59 C. J., Statutes, sec. 500. 51 Am. Jur. 372. Use of public funds or exercise of taxing power to promote patriotism, notes, 30 A. L. R. 1035; 173 A. L. R. 415.

Rehearing denied September 14, 1948.

*Allen G. Thurman, N. J. Cotro-Manes* and *W. Stanford Wagstaff,* all of Salt Lake City, for plaintiff.

*Grover A. Giles,* Atty. Gen., and *Martin M. Larson,* of Salt Lake City, for defendants.

PRATT, Justice (dissenting).

The attention of the reader is invited to the fact that this opinion is the majority opinion only as to the question of the violation of Section 4, Article I of our State Constitution pertaining to the expenditure of public monies for religious purposes. Upon the other issues involved it is a minority opinion, and the majority of the court conclude that the writ should be denied. As this opinion contains a complete statement of the historical and factual back-

ground of the case it introduces the determination of the case on this appeal.

This matter is before us upon petition for an alternative writ of prohibition, which, by stipulation of the parties and in order to expedite final determination, is to be considered as a petition for a peremptory writ of prohibition. The parties also agreed that this court may on its own motion, or upon motion of counsel take evidence with respect to the issues, the same to be submitted either by stipulation, or by the taking of testimony either before the court or by reference.

Plaintiff seeks to restrain the defendants, and perpetually enjoin them from action under and pursuant to certain legislation enacted for the purpose of building a certain memorial building and the display therein of historical relics of this state. The issues will be specifically treated hereafter, but may be classed generally as an attack upon the constitutionality of the legislation from the standpoints of the separation of state and church, of special and irrevocable privilege, and of statutory construction. References herein to the Society or the lessee are references to the Daughters of Utah Pioneers.

Before taking up the legislation directly involved, there is a bit of legislative history that may be of some importance in considering this case. In February 1921, a

*"Resolution authorizing the Governor to appoint a committee of five to investigate and report regarding the provision of a suitable place for the preservation and housing of documents, relics, etc. belonging to and pertaining to the history of the State of Utah"* (italics added)

was passed by our legislature; and it was signed by the Governor, March 5, 1921. This was known as S. J. R. No. 4.

Under the heading "Communications from the Governor" dated February 10, 1923, and bearing the following letter of transmittal, the report of a Committee was submitted and filed and referred to the Committee on Appropriations:

"To the Senate:

"I have the honor to transmit herewith, the report of the committee appointed by me, in compliance with the provisions of Senate Joint Resolution No. 4, Fourteenth Legislature, pertaining to the proposal to erect a suitable building for the housing of State documents, relics and other sources of information relating to the history of Utah.

"Charles R. Mabey,
"Governor

"To the Honorable Charles R. Mabey,
"Governor of Utah.

"Sir:

"The undersigned have the honor herewith to submit their report, in compliance with the terms of Senate Joint Resolution No. 4, passed February 23, 1921, and approved March 5, 1921, which reads as follows:

" 'Whereas the history of any people can only be properly preserved for future generations when a place is provided wherein the documents, relics and other sources of information relating to their life and work may be housed; and

" 'Whereas, we believe that the erection of a memorial building to contain such records and relics would receive the approval of the people of this State; therefore

" 'Be it Resolved by the Legislature of the State of Utah that the Governor is hereby authorized and requested to appoint a committee of five resident citizens of the State, who shall serve without pay, whose duty shall be to consider the subject of the erection of a building for that purpose and to report to the next session of the Legislature.'

"In the exercise of the authority conferred, by this resolution, and in order to carry out its provisions, the Governor, in August, 1921, appointed as said committee, Mrs. Alice Wright of Provo; Mrs. Donnette Smith Kesler; Dr. George W. Middleton, Dr. John Z. Brown, and Mrs. Annie Wells Cannon, all of Salt Lake City; and though the committee has not held a large number of meetings, it nevertheless feels that it has with reasonable thoroughness fulfilled the duty entrusted to it. An investigation has been made as to the whereabouts and condition of many records, documents, relics, etc., pertaining to the history of our State, and we are obliged to report with regret that though Utah is the very heart of Pioneer history in the West *these priceless records and relics are widely scattered and lamentably uncared for except where local patriotic clubs or societies—notably the Daughters of Utah Pioneers—have undertaken the task of collecting and preserving them.* In this connection we beg to draw attention also to the fact that many unique and valuable historical land marks —Cove Fort in Millard County, for example—denoting special phases

in the State's formation and development, are in danger of being destroyed or commercialized through private ownership—a fate which we hardly need say, would be universally deplored, and which obviously can be more easily averted now than at any later date.

"In the course of its inquiries the committee has ascertained that fourteen of the States in the American Union have historical memorial buildings specially devoted to the housing of the records and relics of those commonwealths, while twenty-nine States have space reserved in their respective Capitols for these purposes. Of the remaining eight States, some have placed their historical records in the keeping of their universities—a plan which is generally regarded as unsatisfactory for the reason that such institutions are closed part of the year, also that the documents are not readily accessible, and come under the supervision and control of the school authorities instead of being regarded as the property and heritage of the State.

"Your Committee firmly believes that the time is not far distant when the people of Utah will demand the erection of a Memorial in honor of the labors and achievements of the Pioneers—the founders of their beloved State. With that thought in mind, we recommend that the Legislature now about to convene be asked to reserve a site on the Capitol grounds for the erection of a Pioneer Memorial Building for *the housing and care of all state historical records, documents, relics, etc.*, and for such other purposes as would conduce to the preservation and illustrations of Pioneer history; and that until such building shall be erected proper space be allotted in the State Capitol for the care of such documents and relics as have been or shall be collected.

"*The committee cannot feel to close its report without bestowing a word of commendation upon the untiring and patriotic services of the Daughters of Utah Pioneers in the various counties of the state, in striving to collect and preserve everything of historic interest.* Their energy and zeal in this service deserve state-wide recognition and gratitude.

"In conclusion we desire to express our appreciation of the honor of having been appointed to act on the Pioneer Memorial Committee; and we respectfully advise that the work thus far done, and as represented in this brief report, be carried on with ever-increasing enthusiasm and loyalty until the desired objects are fully attained.

"Respectfully submitted,

"Alice P. Wright
"Donnette Smith Kesler
"Geo. W. Middleton
"John Z. Brown
(Italics added) "Annie Wells Cannon."

Other events of interest were:

On January 27, 1923, a resolution from the Utah Daughters of Pioneers requested an appropriation to take care of their work, was presented and referred to the Committee on Appropriations in the House. No further action appears to have been taken on the resolution.

On January 29, 1923, the following petition was presented:

"To the Senate and House of Representatives of the State of Utah:

"Your Memorialists—the Daughters of Utah Pioneers—respectfully represent that,

"That Society of the Daughters of Utah Pioneers has now been organized for twenty one years, and during that period of time its members have endeavored to carry out the objects of its organization, namely: to perpetuate the names and achievements of the men and women who were the Founders of this great Commonwealth, by preserving old land-marks, collecting relics, establishing a library of pioneer historical matter, securing unprinted manuscripts, photographs, and all such data as shall aid in perfecting a record of the strong character, pure life, and heroic deeds of the pioneers, also to commemorate the advent of the pioneers into the barren wastes of Utah, by observing appropriately the twenty-fourth of July and such other days and advents as are important in Utah History.

"Your Memorialists further represent that, this Society is the only organization which has collected personal biographies of the pioneers of Utah, and that it now has hundreds of such biographies, and thousands of relics systematically filed and registered.

"The Society has had no funds for this purpose up to the present time, save membership fees, a source of revenue which is wholly inadequate, even though all service has been voluntary; wherefore, the Society now feels that its work is of sufficient value and interest to the commonwealth, to be carried on and maintained in a more definite and persistent way.

"In consideration of the foregoing and in order that the ideals and achievements and service of the Founders of the State may be thus perpetuated for future generations,

"Your Memorialists respectfully ask the Fifteenth Legislature of the State of Utah, to grant the Society, Daughters of Utah Pioneers, the sum of two thousand dollars ($2,000.00) per annum to continue

the work above described—the same to be duly accounted for to the proper State Authority:
"Signed:

"Flora Bean Horne,
"President
"Donnette Smith Kesler
"First Vice Pres.
"Julia P. Murdock Farnsworth
"Second Vice Pres.
"Josephine Jane Woodruff
"Secretary."

The petition was referred to the Committee on Appropriations, and apparently no further action was taken during the Fifteenth Session of the Legislature. However, through later years appropriations were made to the Daughters of Utah Pioneers as follows:

| | |
|---|---|
| 1925 | $2,000.00 |
| 1927 | $2,250.00 |
| 1929 | $2,000.00 |
| 1931 | $2,000.00 |
| 1935 | $ 650.00 |

We come now to the legislation directly involved in this controversy.

The first enactment was in 1941.

Chapter 106, Laws of Utah 1941, entitled "Lease of Land to Daughters of Utah Pioneers" is

*"An Act Leasing Certain State Capital Real Estate Known as the Triangle to the Daughters of Utah Pioneers, Incorporated, for the Erection and Maintenance of a Pioneer Memorial Building to Be Used for the Preservation, Housing and Care of Historical Records, Pioneer Documents and Relics Relating to the Life and Work of the Utah Pioneers."* (Quoted from the Act.) (Italics added.)

It provides that the State Land Board is authorized to execute the lease in writing and deliver it to the Daughters of the Utah Pioneers; it describes the land by metes and bounds; it fixes the term of the lease as 99 years, and the rent at $1 per year, payable annually to the State Treasurer

on the first day of March of each year commencing with the year 1943. It provides, however, for certain conditions: That the lessee shall deposit with the State Treasurer the sum of $50,000 not later than February 1, 1943, as evidence of the lessee's ability to *"carry out a building project"* (italics added) ; and provides that said sum, *with other funds* is to be used in the erecting of the building designated the Pioneer Memorial Building. The act also provides that the building shall not be subject to taxes or liens of any kind whatsoever, and that the building shall be completed in time for the 1947 Centennial exhibition. The act ends with the provision that the lessee's failure to perform any of the foregoing conditions will *automatically* terminate the lease. (This law was carried into our 1943 Code as Sections 86-1-48.10 to and including 86-1-48.13.)

Pursuant to the 1941 law, and on June 5, 1941, the following lease was executed:

"Lease

"Know All Men by These Presents:

"That the State of Utah, by and through its State Land Board, lessor, and by virtue of Chapter 106, Laws of Utah, 1941, and in consideration of the rents and covenants hereinafter set forth, does hereby lease and let unto the Daughters of the Utah Pioneers, Incorporated, a non pecuniary Corporation, organized and existing under and by virtue of the laws of the State of Utah, lessee, the following described property, located in Salt Lake County, State of Utah, and particularly described as follows:

"Commencing at the SW cor of Lot 5, Block 11, Plat "E", Salt Lake City Survey; thence No. 23° 51' 45" W. 25.0'; thence No. 89° 59' 13" E. 187.43' to the West line of Columbus Street; thence along the West line of Columbus Street So. 17° 47' 15" W. 257.49'; thence No. 23° 51' 45" W. 243.52' to the point of commencement, upon the following terms, conditions and covenants, to wit:

"1. The term of this lease shall be for a period of ninety nine (99) years, beginning upon the date of execution hereof.

"2. The lessee shall pay to the lessor as rental for the above premises the sum of One Dollar ($1.00) per year, payable annually to the State Treasurer of the State of Utah on the first day of March of each year commencing with the year, 1943.

"3. The said premises shall be used by the lessee for memorial purposes and for the erection of a Pioneer Memorial Building, which shall be suitable for said purposes, and which *shall be constructed, maintained, and operated solely at the expense of the said lessee.*

"4. The lessee shall deposit with the State Treasurer of the State of Utah the sum of Fifty Thousand Dollars ($50,000) no later than February 1, 1943, as evidence of its ability to carry out a building project upon said lands for the purpose above stated, and said sum, together with other monies, is to be used in the erection upon said premises of said Pioneer Memorial Building which shall not be subject to taxes or liens of any kind whatsoever.

"5. The said building shall be completed and ready for public reception before the Utah State Centennial Celebration, which will begin during the year 1947.

"6. The lessee will peaceably and quietly surrender the possession of the said premises to the lessor upon the termination of this lease, including all improvements thereon.

"7. The said lessee will not assign or sublet the said premises or any portion thereof during the term of this lease without first obtaining the written consent of lessor.

"8. *The failure on the part of lessee to perform the foregoing terms and conditions, or any of them will automatically terminate this lease.*

"In Witness Whereof, the said Lessor has set its hand at the Capitol, Salt Lake City, Utah, this Fifth Day of June, 1941.

"The State of Utah
"The State Land Board
 "By H. Warren Taylor /s/
 "Executive Secretary of the State
 "Land Board
duly authorized to execute this lease by a resolution of the State Land Board, made and entered on the Third Day of March, 1941." (Italics added.)

The next legislative enactment of importance was in 1943. By Chapter 95, L. Utah, 1943, the 1941-43 law was amended by allowing U. S. bonds, or Utah State bonds to be submitted in lieu of the $50,000 cash previously required, and changing the date the fund is to be available to February 1, 1945.

The next amendment was in 1945. Chap. 128, L. of U. 1945. This amendment increased the $50,000 to $75,000, and provided that it must be available by February 1, 1946.

It is provided further that this fund with other funds is to be used in the erection of the Memorial Building, and also that the fund may, with the consent of the Governor, be used for the purchase of additional land in the name of the State of Utah. It also includes a provision that the building shall be erected for the *purpose of depicting the history of Utah in a proper display of relics.* It adds further that the erection of the building shall commence when the Governor shall determine that labor and materials are available, and that the best interests of the State shall be served. There is another section added covering appropriations for the project. This section reads:

"There is hereby appropriated to the Utah state building board out of any unappropriated funds in the general fund the sum of $225,000.00 to be used toward the construction of the said memorial building and for the purchase of additional land adjacent to the said capitol grounds in the event the governor shall consent in writing to such purchase. *Provided, however,* that no portion of the said $225,000.00 shall be used until the daughters of the Utah pioneers, inc., shall have deposited with the state treasurer the sum of $75,000.00, or its equivalent, in United States or Utah state bonds, and provided that *the funds herein appropriated shall be available only to the extent that may be required to supplement the funds of the daughters of Utah pioneers, inc., and any federal funds that may become available for such construction.* All unexpended balances of any moneys appropriated by this act shall be turned over to the state treasurer for the credit of the Utah state building board for the purposes herein specified." (Italics added.)

This is the first appearance of an appropriation of money pursuant to the law and for this project. It is to be noted that these funds are intended to be

"available *only* to the extent that may be required to *supplement* the funds of [the lessee] and any federal funds that may become available for such construction." (Italics added.)

To "supplement" is "to fill the deficiencies" (Webster).

In the 1947 laws, Ch. 122, L. U. 1947, the following sections covering the Reserve Building Fund act are of importance:

"Section 1. There shall be a fund to be known as the Reserve Building Fund. Withdrawal therefrom shall be for buildings, the construc-

tion of which may hereafter be authorized by law, or which may be approved for construction by the Board of Examiners. Transfer of funds therefrom to the Building Commission for building purposes shall be done by the proper fiscal officer upon certification by the Board of Examiners, if specific building is authorized by law; and upon certification of the Board of Examiners if and when building is authorized by the Board of Examiners as in this act provided.

* * * * *

"Section 4. There is appropriated to the Reserve Building Fund from the State General Fund the sum of $3,000,000, or so much thereof as may be raised by a State property tax levy for general fund in the years 1947 and 1948.

"Section 5. Appropriations made by this act shall be expended, as provided by law, subject to the provisions of this act, for the following purposes:

* * * * *

"9. Pioneer Memorial Building $150,000."

This last act became effective March 18, 1947. On October 15, 1947 a construction contract was entered into between the Utah State Building Board, called the "Owner" and the Paulsen Construction Co., reciting that the "Owner" intends to construct a "Pioneer Memorial Building for the Daughters of the Utah Pioneers" on the lot in question. It also states that the scope of the work is contained in certain specifications and plans. These plans and specifications set out the details of construction and include such as: Lecture room, exhibit rooms, little theater, library, board room, office, editors room, manuscript room, "Brigham Young" room, and Kitchen unit. The initial or plot plan bears the *written approval* of the Daughters of Utah Pioneers by three members of the society designating themselves as President, Chairman, and Treasurer. The specifications in their caption and in detail repeat that the construction of the building is for the Daughters of the Utah Pioneers. The society badge is an ox yoke surmounted by a beehive and bearing the words: "Daughters Utah Pioneers." (Art. X, their Constitution.) On the first floor plan of the grand stair hall this symbol is included as part of the decorative construction, similar, it might be said, to the representative symbol

of recognized clubs in their club houses. The contract price is $364,794. The contract does not bear the signature of the Society.

So much for the laws and the action of the parties pursuant thereto. We shall now give some consideration to the Society (lessee) known as the Daughters of Utah Pioneers.

This organization came into being many years before the date it was incorporated—April 2, 1925. It is a non-profit organization, which on that date was incorporated for 100 years for the avowed purpose of

"collecting and preserving in every possible way the History of the State of Utah and her people" (quoted from its articles of incorporation).

In its constitution we find these provisions:

Article III (qualification for membership and application for)

"Section 2. Any woman shall be eligible to membership in this society who is over the age of 18 years, of good character, and a lineal descendant of an ancestor who came to Utah prior to the advent of the railroad, May 10, 1869."

"Section 3. Application. (a) Every application for admission to membership shall be made in writing upon duplicate forms prescribed in the By-laws, and shall state the proof of claims of the applicant required by Section 2 of this article."

The by-laws do not prescribe a form. However, a form of application has been submitted for consideration. It is addressed to the Society of Daughters of Utah Pioneers, with appropriate blanks for listing the ancestral chain to the pioneer upon whom applicant's admission to the society is dependent. A space is provided for answer to this statement about ancestors:

"Give brief history of what they did to help establish the community in which they lived."

The answer to the following statement is also included therewith:

"Give references to documental or other authorities and submit same or authenticated copies."

"Section 4. Election of Members.

"(a) The Central Registrar shall present such application together with said endorsement and her own verification and signature, to the regular meeting of the Central Company, and if a majority of the members present vote for admission of such applicant, she shall become a registered member upon the filing of her papers with the Central Company, and a membership card and her duplicate paper shall be forwarded to her by the Registrar of the Central Company.

"(b) Any member whose papers are filed with the Central Company may become a member of any local Camp where she resides upon presenting her membership card."

Article II sets out the objects of the corporation as follows:

"The objects of this society shall be to perpetuate the names and achievements of the men and women who were the pioneers in founding this commonwealth; by preserving old landmarks, collecting relics, establishing a library of pioneer historical matter, securing unprinted manuscripts, photographs, and all such data as shall aid in perfecting a record of the strong character, pure life, and heroic deeds of the pioneers; *by seeking to promote and carry out the objects and purposes which the pioneers had in view when they sacrificed all that they possessed and turned their faces to the West to seek homes in these mountains;* by commemorating the advent of the pioneers into the barren wastes of Utah and such other days and advents as are important in the history of the early days; *by* reviewing the lives of the pioneers, *teaching their descendants and the citizens of our country the lessons of faith, courage, and patriotism,* and by creating a spirit of union and fellowship among the posterity of the pioneers." (Italics added.)

Article IV, covering organization, includes this:

"This Society shall consist of a Central Company, established at Salt Lake City, which is the presiding Company of the Society, and whose officers shall be residents of the State of Utah, nine of whom shall constitute a quorum to transact business. County Companies and local Camps may be organized throughout Utah and other states, territories and foreign countries in the following manner:

"Section 1.—Organizing Companies or Camps. * * *

"(b) All new Camps shall be organized on L. D. S. ward lines and all eligible daughters living within the confines of such wards should

be members of the Camp. Whenever the Central Company deems it for the best interest of the Society to divide any Camp, it may direct the County Company to do so.

"(c) Whenever ten or more lineal descendants of Utah Pioneers shall petition the Central Company, stating their desire to be formed into a County Company in this Society, the presiding officers shall issue authority to hold a meeting and elect a President and such other officers as are deemed necessary, and report the results of said election to the Chairman of Organization of the Central Company. The Chairman of Organization shall present such report to the next meeting of the Central Company, and upon approval of said report the said County Company will become a part of this Society.

"(d) Whenever ten or more lineal descendants of Utah Pioneers living within an L. D. S. Ward shall petition the County Company, stating their desire to be formed into a Camp in this Society, the presiding officers shall issue authority to hold a meeting and elect a Captain and such other officers as are deemed necessary, and report the results of said election to the County Company. The President of the County Company shall present such report to the next meeting of the County Company, and upon approval of said report the said Camp will become a part of this Society."

Under the by-laws, the duties of Historian and of the Chorister include the following:

"The Historian, together with the assistant historians, shall collect Pioneer historical matter including manuscripts, photographs, etc., and file in the Historical Library of the Society histories of Utah Pioneers and other matter of vital interest; edit some historical matter for the benefit of the society to be read at the annual encampment or convention and submit the year's necrological report."

"The Choristers of the County Companies and Camps shall search for and collect Pioneer songs and file them in the Pioneer Historical Library; be responsible for and keep a record of same, and submit a copy thereof to the Historian of the Central Company; conduct the congregational singing; serve as a member of the program committee, and promote concerts, operas, etc., and encourage the spirit of music in general."

The word "necrological" used in the last sentence of the paragraph about the "Historian" is defined by Webster as pertaining to necrology, which latter term has among its definitions: A register of deaths especially in an ecclesiastical organization; and also a roll of the dead.

In addition to the above facts, the evidence before us discloses that membership in the society is not limited to those applicants who are members of the Mormon Church. The society disclaims any record of the religious faith of its members, but states there are known members of other faiths.

Apparently there is no conflict over the fact that the society does possess, either as owner or as custodian, articles and literature of a historical value; and these items are not limited merely to such as are peculiar to the Mormon faith.

We come now to the first issue. Section 4, Article I of our State Constitution includes this:

"* * * No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment. * * *"

It is the plaintiff's contention that the law which is the foundation of this project violates the above constitutional provision. In particular plaintiff stresses the objects of the corporate society (Art. II quoted above) as being religious —in effect the perpetuation of the Mormon faith, and that to appropriate money for their benefit is flying right in the teeth of the constitutional prohibition.

This is a question of grave importance. We quote some expressions upon the question of the separation of church and state:

From *Board of Education of the City of Cincinnati* v. *Minor,* 1872, 23 Ohio 211, 13 Am. Rep. 233:

"Let the state not only keep its own hands off, but let it also see to it that religious sects keep their hands off each other. Let religious doctrines have a fair field—and a free intellectual, moral and spiritual conflict. The weakest—that is, the intellectually, morally, and spiritually weakest—will go to the wall, and the best will triumph in the end. This is the golden truth which it has taken the world eighteen centuries to learn, and which has at last solved the terrible enigma of Church and State."

From the very recent decision of the Supreme Court of the United States, *People of State of Illinois ex rel. McCollum* v. *Board of Education*, Champaign County, Illinois, 68 S. Ct. 461, 464:

"Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force or influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion."

This above quotation is found also in *Everson* v. *Board of Education*, 330 U. S. 1, 67 S. Ct. 504, 91 L. Ed. 711, 168 A. L. R. 1392:

"We renew our conviction that 'we have staked the very existence of our country on the faith that complete separation between the state and religion is best for the state and best for religion.' *Everson* v. *Board of Education*, 330 U. S. at page 59, 67 S. Ct. at page 532 [91 L. Ed. 711, 168 A. L. R. 1392]. If nowhere else, in the relation between Church and State, 'good fences make good neighbors'."

This latter statement appears in the opinion of Mr. Justice Frankfurter.

The sentence preceding the quotation we have set out above as taken from Section 4, Article I of our State Constitution has this to say:

"There shall be no union of Church and State, nor shall any church dominate the State or interfere with its functions."

Is the picture now submitted to us one that evidences a potential hazard in the nature of a step toward a breaking down of that separation of Church and State? To answer this question we cannot avoid reference to certain facts of historical importance.

Religious persecution of a particular faith—the Mormon —led to the settlement of this State. Prior to the advent of the railroad the great majority of the immigrants were of that faith. Naturally much of the history they left— many of the relics they left, will be viewed in the light of

that religion as distinguished from others. Naturally too, descendants of those pioneers are very apt to be in the large majority of any group that has for its foundation relationship to the pioneers of that period. The few of other faiths who may become members of such a group, in all probability will be divided between those whose ancestors were non-Mormon, and those who have left the faith of their Mormon ancestry. Thus we have a situation in this State that if we are not careful in applying, in our endeavors to uphold the constitutional separation of Church and State, may forever doom this State to silence about its own history for fear it may violate its own constitutional prohibition. For example: As indicated above, one of the proposed rooms of this Memorial Building is designated the "Brigham Young" room. Let us assume that in that room there is placed for exhibition such relics as the carriage or wagon in which he rode as he entered the Valley, and heirlooms with which he had personal contact—part of the exhibits now on display in this Capitol. This man is conceded a leading place in the historical archives of this nation. He is known as the leader of a religious faith that survived a severe persecution and ordeals of emigration that have not been surpassed. That room with such a display in it would have proselyting value in and of itself, by reason of historical circumstances we could not now control, unless we held that even the State as a public body could not open it for display for fear of violating the State Constitution.

It would seem fair and just to say that an impartial display of historically valuable exhibits will not lose its impartiality because historically those exhibits were born in an effort of a particular religious faith to survive persecution, and in and of themselves possess proselyting value to that faith.

The serious question is: How will they be displayed? To answer this question plaintiff in effect says that they will be displayed to further the objects of the society, and

as one of those objects is the perpetuation of the Mormon faith, they will be displayed for religious purposes. This, of course, is denied by the defendants.

At its best human nature is weak in its efforts to exercise impartiality. This weakness is accentuated under circumstances where the responsibility is group rather than individual. If the question of religion comes into the picture there arises a tendency to shut out all argument that opposes the religious emotional desires. Given then a society predominantly of one faith, and imbued with the idea of proselyting—if that be their idea—and there is no question that the best of legal phraseology in the wording of their objectives will be but a small hurdle in a road to perpetuating the faith of their choice. How then are we to estimate such potentialities?

It would seem that old adage "Actions speak louder than words" might be a proper criterion upon which to base our estimate. Is there *positive* evidence of efforts on the part of this society to favor any particular religious faith? We use the expression "positive" in view of the fact that we wish to avoid a decision founded upon suspicion. It is very easy to conclude from the religious atmosphere of many of the historical exhibits, and from the predominance of one faith all over all others in the membership of the society, that the predominant faith will to say the least, receive the greater amount of the benefit from the exhibit. Is this not, however, a coincidence of history rather than a deliberate attempt to further that faith? Should we not require proof of overt acts of proselyting before we conclude that the nature of the society is such that it cannot function impartially in the contemplated position of exhibitor— this assuming, of course, that its declared purposes are insufficient foundation for such determination?

Is one of its objects the perpetuation of the Mormon faith? In particular plaintiff invites attention to the wording of Art. II of its constitution (quoted). What

about the object being that of seeking religious freedom—an interpretation broader than that for which plaintiff contends? Undoubtedly the pioneers of the Mormon faith came out West that they might worship as they pleased. Without religious freedom they could not exercise their belief in their faith. Educating one to the belief of religious freedom is not the "exercise of," "instruction in" or "worship" in any religious faith. The school history we teach our children builds up in their minds the importance of religious freedom. The constitutional prohibition in question evidences our belief in that principle. A society including the purpose of educating the people in that belief, as one of its objectives, is not, by reason of such inclusion, an "ecclesiastical establishment." If then it is proper to view their objective as that of emphasizing the importance of religious freedom, we must look elsewhere—to their actions—for a determination of what they believe is one of the purposes of their organization. Which then should we select as definitive of the object: education in the belief in religious freedom, or perpetuation of the Mormon faith?

The language used by the Society in declaring its objects is general and capable of more than one interpretation. We, of course, are not justified in giving an interpretation that will hurdle the constitutional prohibition, simply for the reason that such an interpretation will avoid the constitutional difficulty, if, as a matter of fact, the society has adopted as their interpretation that which is unconstitutional. To do so would defeat the very purpose of the prohibition. As a result we are forced to view the object from the standpoint of the evidence before us that bears upon the society's interpretation of its own objectives.

We have no evidence of any activity on the part of the society indicative of proselyting the Mormon faith. Part of its organization—the Camp—is upon L. D. S. ward lines. This seems to be merely a method of dividing the society up by locality. The Wards of the Mormon Church are well

known or easily ascertained territorial limitations or areas, that afford a convenient method of territorial designation. Membership in the society is not limited to members of one faith—in fact, other faiths are now represented—a fact that is rather inconsistent with the idea of upholding a particular faith, unless we assume it a deliberate camouflage to cover ulterior motives. There is no foundation for such an assumption. The use of the word "necrological" in the duties of the historian does have an ecclesiastical interpretation, but has as well a use as pertaining to a roll of the dead, without religious significance. The nature of the exhibits and the proposed room arrangement of the Memorial Building above have already been mentioned.

From all these facts we are unable to say that the "perpetuation of the Mormon faith" interpretation is any stronger, if as strong, as that of the belief in religious freedom. The language of the Article is general, and as the right to believe in any faith is contingent upon the existence of religious freedom, we are of the opinion that the proper interpretation is that of the belief in religious freedom.

For the reasons given the majority of this court hold that Section 4, Article I of our State Constitution has not been violated.

I come now to the other issues, the violation of the following sections of our Constitution: (My solution of these issues does not meet the approval of the other members of this court.)

Article I, Section 23:

"No law shall be passed granting irrevocably any franchise, privilege or immunity."

Article I, Section 24:

"All laws of a general nature shall have uniform operation."

Article VI, Section 26, Par. 16:

"The Legislature is prohibited from enacting any private or special laws in the following cases:

\* \* \* \* \*

"16. Granting to an individual, association or corporation any privilege, immunity or franchise."

These issues in my opinion bring to light some bad features about the law and the project.

In 1921, when the matter was first presented to the legislature (see opening paragraphs of this opinion), the proponents had a correct view of the project in mind: The construction of a public building for *all* exhibits. Although praise was given the Daughters of Utah Pioneers for their efforts, no suggestion was made that their possessions should be the sole beneficiaries of the use of the building. Recognition was given to the fact that others possessed historically valuable material. *It seems unquestionable that a display by the State of State historical material is the exercise of a public purpose.* Furthermore it is non-the-less public if the state sees fit to put the display in charge of a particular individual or group. Doubt creeps in, however, if we find that such supervision includes the power to exclude from the display anything that does not meet the approval of the supervisor. Supervisory control may include the power to reject particular items, but the grounds for rejection should be in the interest of the public, not in the interest of the supervisor.

Let us examine the law and the lease of 1941. It seems obvious that when this law was enacted and this lease executed, all parties had in mind that the building was to be erected by the society, was to be operated by the society and was to be maintained by the society "solely" at its expense. A failure of any of these terms of the lease was to automatically terminate the lease; and in case the lease terminated, all improvements were to become the property of the lessor.

In *C. I. R.* v. *Hills*, 10 Cir., 115 F. 2d 322, Hills leased a lot in Salt Lake City to a corporation for a term of 50 years, lessee to erect a building costing not less than $35,-

000. A provision of the lease was as follows: "At the expiration of this lease the improvements on said property shall become the property of the parties of the first part" (lessor). The case held that the language of the lease in effect made this building the personal property of the lessee until termination of the lease. This case is in point. However, the cases cited by it as authority, including a Utah case are not in point in facts on this question. The cases cited by the court are cases where the lessee had the right to remove the improvements at the end of the period of the lease.

The case *Helvering, C. I. R.* v. *Bruun,* 8 Cir., 105 F. 2d 442, announces what is the general rule as to the ownership of improvements placed on the premises by the lessee, stating that it is a question of intent to be determined by the language used in the written lease. Another case on the subject is: *Central Coal & Lumber Co.* v. *Board of Equalization,* 70 Okl. 131, 173 P. 442.

It seems clear that the reference to the purpose of the deposit by the society in the present case; the reference to the building's freedom from taxes and liens; and the reference to the surrender of improvements upon termination of the lease, all indicate strongly that the parties to this controversy were taking the view that the building was to be that of the society for the duration of the lease—99 years. However, whether we wish to go that far or not in our holding, it is sufficient to say that the lessee was to have exclusive control of the use of the building, except it shall be used as a memorial building and there shall be "proper" display of historical material. "Proper" savors of the manner of display, rather than the quantum of the display. There is nothing in the law or the lease that would require the society to accept historical material owned or in the custody of others—even that in the custody of the landlord. The State has an historical society, Title 85, Chapt. 5, U. C. A. 1943, as amended by Chapt. 123, L. of U. 1945, which presumably has in its possession many historical records. They

could not be displayed in this building without the consent of the lessee, as no such right has been reserved by the lessor.

The 1941 law contemplated the housing and care of the exhibits. The 1945 law brought into the picture the additional provision of a proper display of exhibits. With this 1945 law, the picture began to change. A large appropriation is provided for the purpose of *supplementing* the funds of the society. We defined "to supplement" above. If we compare the funds deposited by the society—$75,000—with the total appropriation for the project—$375,00—and with the contract price for the construction of the building— $364,794—we find that we have rather tail-waging-the-dog version of supplementation, without any provisions for the society to make up that large deficiency. These facts indicate clearly that the project has now become one of construction by the State *for the lessee,* in spite of the fact that one of the conditions of the lease and the 1941 law is that if the lessee fails in performance of any of its terms that agreement shall "automatically" terminate—*and one of those terms is that the lessee shall construct* the building. In 1947 when the construction contract was finally let, construction by the State, rather than by the Society became an accepted fact by the parties—and this in spite of the fact that none of the amendments to the 1941 law specifically amended, or evidenced to the public any intention to change the basic provision as to such construction.

Let us now examine into the nature of the proposed building. Exhibit rooms, lecture rooms, board rooms, office editorial room, library, manuscript rooms, little theater, are all consistent with public purposes, even though they might be found in private club rooms depending upon the nature of the club. On the other hand, the symbol of the society included as part of the decorative construction of building points to the exclusiveness of a club in its use. Had the seal of the state been placed in the wall, no such complaint could have been made. A kitchen unit adds some to this thought

of a club house or its equivalent. These facts are consistent with the original thought that this building was to be exclusively that of the Daughters of Utah Pioneers. If exclusively theirs, regardless of who builds it, undoubtedly their control of it and its use would be exclusive.

Numerous authorities upon the questions involved in this issue have been cited by the parties. I shall discuss some of them.

Defendants stress the contention that the Society is organized for a public purpose, and that the appropriation of funds is not to a private use or to a private party. One of the cases cited is *State ex rel. Trustees of La Crosse Public Library* v. *Bentley*, 163 Wis. 632, 158 N. W. 306, 308. Let us make comparison. In that case the La Crosse Public Library was incorporated for the purpose of establishing and maintaining a public library *for the benefit and the free use of the people* of the City of La Crosse. In the case now before us, there is nothing said in the incorporation about the collection and/or preservation of the history of the State of Utah being for the benefit or for the use of the public. In the objects of this Society although expressions are used indicating a desire to teach the objects and purposes of the pioneers, and the lessons of faith, courage, patriotism and a spirit of union and good fellowship—whether free or not, does not appear—there is nothing said about the public's free use of the history and relics. Furthermore the by-law covering the duties of Historian has a provision that access to any manuscript for historical purposes shall not be allowed except by permission of designated boards—rather evidencing the desire to withhold from public consideration, those manuscripts.

In the La Crosse case, the aid of the court was sought to compel delivery of some $6,000 in taxes to the trustees of the library, the same as had occurred in previous years. The issue raised was as to the appropriation being for a public purpose. The court held that it was, holding that the library

managed by this organization was as free and public in its functions as one organized under state law. The court said further that the law authorized library funds by taxation for the support and maintenance of any established secular and non-sectarian *public* library, and reading room *free* to the inhabitants of a city. In laying down the test to be applied where supervision lies in the hands of a non governmental agency, the court said:

"* * * its employment, *under reasonable regulations for control and accountability to secure public interests,* is legitimate and constitutional. * * * As indicated in *Curtis's Adm'r.* v. *Whipple,* 24 Wis. 350 [1 Am. Rep. 187], it is not sufficient that an enterprise be one in which the public are interested and which might be conducted at public expense, to warrant the using of the taxing power to aid it ex donatio; but it may be used for the purpose of compensating for an equivalent in public service *rendered under proper regulations to protect municipal interests,* unless the particular governmental function to which it relates is expressly or by necessary implication restricted to public agencies." (Italics added.)

This quotation is part of a quotation the Court took from *Wisconsin Industrial School for Girls* v. *Clark County,* 103 Wis. 651, 79 N. W. 422. In the present Utah case there are no control provisions that would enable the State to enforce public use, other than what might be implied from the words "proper display." Should the Society desire, it could limit the display to any part of its possessions it saw fit. The Society as tenant and, for all practical purposes, owner of the building would have much broader powers than merely those of an employee. It is conceivable that the display of historical material could become a secondary matter to the social functioning of the Society in a publicly constructed building.

Plaintiff cites the case of *Frohliger* v. *Richardson,* 63 Cal. App. 209, 218 P. 497. In that case the appropriation of $10,-000 for the restoration of the San Diego Mission was attacked as unconstitutional. The building was owned by the Roman Catholic Church, and was used for religious pur-

poses. It was not at any time under the management and control of the State of California. The articles of the California Constitution alleged to have been violated covered the religious question, the question of a gift to a corporation or individual, and particularly one that prohibited appropriations to any corporation or institution not under the exclusive management or control of the state. All three were held to have been violated. I call attention to the case, however, by reason of the fact that the Court in rather glowing terms recognized the importance of the missions as historical background for the state, but said that in spite of their public importance and interest the appropriation ran afoul of the constitution.

Defendants invite our attention to the fact that the answer to the question of what is a public purpose is for the legislature, not the courts. Previously in this decision I expressed the opinion that a display by the State either directly or through a properly authorized agent is the exercise of a public purpose. The trouble in this case is that there is no certainty of the exercise of such a purpose at all. When the alleged agent is left free to decide just what shall be considered to the public interest, if anything, there is no assurance that the public interest will be subserved.

A rather interesting case for comparison—one cited by the plaintiff—is *Kingman* v. *City of Brockton,* 153 Mass. 255, 26 N. E. 998, 999, 11 L. R. A. 123. The Massachusetts State legislature authorized the City to appropriate money for the erection of a memorial hall to be used and maintained as a memorial to the soldiers and sailors of the War of Rebellion. The City appropriated $40,000 for a memorial hall and public library building, a part thereof to be for the use of Fletcher Webster Post G. A. R. No. 13, so long as the post continued to exist as an organization. It was provided that the plans should be approved by the trustees of that post. In the present Utah case the plot plan has been approved by the Daughters of Utah Pioneers—it may be that approval of the plot plan, which is the first sheet of

the plans, was intended as approval of all plans. The present lease is for 99 years from 1941; the Society was incorporated for 100 years from 1925. Among other things said by the court in the Massachusetts case is this:

"There is no definition of public purpose or use which can include the maintenance and support of a Grand Army post."

Is this Massachusetts case not a parallel situation to the present Utah case? It seems clear that this Memorial Building is going to be used by the Daughters of the Utah Pioneers as their headquarters. Will the interest of the public in their exhibits make it more of a public purpose than the memorial value of that part of the Massachusetts memorial not used for the G. A. R. post?

Defendants have cited an excellent Annotation (30 A. L. R. 1029 et seq.) upholding the use of public funds or the exercise of taxing power to promote patriotism. There are any number of cases upholding memorials for that purpose, but there are certain facts that should not be overlooked in attempting to apply those principles to the present case. It is not the sense of the 1941 law, with its amendments, to erect this building merely as a memorial in the form of an edifice rather than a shaft or a bit of statuary. The principal reason for the memorial is the use to which it is to be placed—presumably that of an archive wherein the public is to be afforded the opportunity of viewing the history of this state in the form of historical material and relics left by the pioneers. That the building itself may have memorial value as representative of part of the early history of this community is only an incident of the total purpose. The question is broader than that which might have arisen had the purpose of the law been merely to erect a monument which depended upon its appearance and not its use for its patriotic inspiration. A consideration of use involves necessarily a question of whose use, the public's or a restricted number of the public; and if a restricted number, is that restriction such as covers all of a given classification such as

the veterans memorial cases. See *Veteran's Welfare Board* v. *Riley,* 189 Cal. 159, 208 P. 678, 22 A. L. R. 1531, 1542, also the *Kingman case* cited above.

Do the facts, the lease and the law involved in this project show an expenditure for a public purpose? I think not. For all practical purposes the building is to be built and given to the Society with no reservation as to control of its use. It in effect includes in the control by the Society the power to exclude historical material regardless of merit, unless that material is either given outright to the Society, or subjected to their personal control. It is comparable to a situation of erecting a memorial hall for veterans generally, to be occupied, however, by a particular post, which post shall have the final determination as to whom shall be admitted as a veteran. The predominant benefit is to the post or the society; the incidental benefit is to the public. That situation should be in reverse.

The uniform operation of a law is not governed solely by uniformity as to persons. If it operates upon entities or things of a class, it should be uniform as to them. This law covers historical material or relics, but instead of covering all historical material or relics, is by its limitation to the Society limited to that acquired by the Society. In effect it grants that Society a particular advantage over all others as to its possessions. 50 Am. Jur. 21, sec. 7. It grants a special privilege. *Allen* v. *Trueman,* 100 Utah 36, 110 P. 2d 355. The duration and nature of the grant is such that I am constrained to conclude that it violates Art. I, sec. 23, and Art. VI, Sec. 26, par. 16 of the Constitution of this State. See *Utah Mfrs' Ass'n* v. *Stewart,* 82 Utah 198, 23 P. 2d 229, headnote 5.

A third objection raised by plaintiff is that the law violates Section 23 of Article VI of our Constitution, which provides:

"Except general appropriation bills, and bills for the codification and general revision of laws, no bill shall be passed containing more

than one subject, *which shall be clearly expressed in its title.*" (Italics added.)

Their objection goes to the amendments as well as the original law.

For purposes of comparison let us requote the original title of this law (1941):

"An Act Leasing Certain State Capitol Real Estate Known as the Triangle to the Daughters of Utah Pioneers, Incorporated, for the Erection and Maintenance of a Pioneer Memorial Building to Be Used for the Preservation, Housing, and Care of Historical Records, Pioneer Documents and Relics Relating to the Life and Work of the Utah Pioneers."

This title is carried into the 1943 Code (see par. preceding Sec. 86-1-48.10).

Obviously this contemplates a very simple thing—a lease of public land to the lessees for specific use by them. The use they are to make of the land is the erection and maintenance of a memorial building and the preservation therein of the designated historical relics. The scope of the public side of this transaction is a lease of public land. Section 86-1-48.12 of this law emphasizes the fact that all the State intended was the lease of public land, as it requires a specified payment by the lessees to evidence their financial ability to perform their side of the transaction—the erection of the building.

Now let us consider the 1943 amendment, chapter 95, Laws of Utah 1943, which reads as follows:

"State Lands. An Act Amending Section 86-1-48.12, Utah Code Annotated 1943, Relating to the Leasing of a Portion of the State Capitol Grounds to the Daughters of Utah Pioneers, Incorporated, for the Purpose of Erecting a Pioneer Memorial Building."

The section amended is referred to by number and located by reference to a part of the title of the original act. The amendment consists of changing that specified payment

from cash to bonds. Clearly the amendment contains nothing but what could have been included

"in the original act *under its title.*" (Italics added.)

This quotation is from the case of *Intermountain Title Guaranty Co.* v. *State Tax Comm.*, 107 Utah 222, 152 P. 2d 724, 726, and from that part thereof reading as follows:

"This court has decided numerous times that if the amendatory act refers by the number to the section of the law to be amended and declares that it is being amended, the constitutional provision is satisfied, as long as the amended act contains subject matter which could have been included in *the original act under its title.*" (Italics added.)

Now let us consider the 1945 Amendment, Chapt. 128, Laws of Utah 1945, which reads as follows:

"Lease Of Lands To Daughters Of *Confederacy* (Italics added.) An Act Amending Section 86-1-48.12, Utah Code Annotated 1943, as Amended by Chapter 95, Laws of Utah, 1943, Relating to the Leasing of a Portion of the State Capitol Grounds to the Daughters of the Utah Pioneers, Inc., for the Purpose of Erecting a Pioneer Memorial Building and the Purchase of Additional Lands and Making an Appropriation."

(Obviously "Confederacy" is a clerical error.) Again the amendment refers by number to the section to be amended and locates it by reference to part of the title of the original act. We have something added, however: "and the Purchase of Additional Lands and Making an Appropriation." What does this phrase mean?

Keeping in mind the intent of the original act—that of leasing public land—possibly this would not be inconsistent therewith, as an insufficient amount of land in the original lease no doubt could be added to without changing the transaction to something other than a lease of land. Naturally the purchase of additional land calls for an appropriation. As a matter of fact the amendment did include authority to purchase additional land. But, upon examination of the amendment we find something new—something more than

just a lease of public land—in fact something at odds with lessees' use as contemplated by the original act. *The state is to build the building with public funds.* If upheld as a proper amendment then, under an original title of *leasing public land,* we find leasing public land, building a public building and leasing a public building. Instead of remodeling the old home we've torn it down and built a duplex—or probably triplex is the appropriate word—and called it remodeling.

It doesn't ease the matter any by stating that the public funds shall supplement those of the lessees. As evidenced by the appropriations and the construction contract price the supplementation is just the reverse. Furthermore the picture is completely confused by a retention of the *lessees' specific payment to evidence its ability to construct the building,* the amount of which is raised from $50,000 to $75,000. What difference does it make that the lessees may or may not be able to "carry out a building project" (1941 law) if the State builds the building? One wonders if this retention of the specified payment and the reference to the supplementation are not included to impress the reader with the thought that the amendments have not changed the scope of the original act from that of merely a lease so far as the state is concerned.

What is the purpose of such a constitutional provision as Sec. 23, Art. VI? *The title of an act defines its scope.* 50 Am. Jur. 162, Sec. 183.

"The mischief sought to be remedied by the constitutional requirement of a single subject or object of legislation was the practice of enacting omnibus bills, or of bringing together in one bill matters diverse in nature, and foreign to each other, that is, matters having no connection with each other, either proper or necessary, but often entirely unrelated and even incongruous." 5 Am. Jur. 173, Sec. 193.

This section goes on to say that the abuse of attaching unpopular legislation to meritorious legislation in order to get it by was one of the ills sought to be overcome. Along this line one might ask: Would the original act have met with public favor if it had been known that what was really

contemplated was that the State with its own funds was going to build a building to be leased to these lessees—not just lease them some unoccupied land?

In closing, attention is invited to the following quotation from the case of *Edler* v. *Edwards*, 34 Utah 13 at page 19, 95 P. 367, at page 368—notice the emphasis placed upon the words "under its title":

"The constitutional requirement under discussion as applied to acts of this character (amendatory acts), when they contain matter which might appropriately have been incorporated in the original act *under its title*, is satisfied generally if the amendatory or supplemental act identifies the original act by its title, and declares the purpose to amend or supplement it. *Under such a title*, alterations by excision, addition, or substitution may be made, and any provision may be enacted which might have been incorporated in the original act." (Italics added.)

For the reasons given I am of the opinion the peremptory writ should issue and be made permanent, however the majority are of the opposite conclusion. The writ is denied.

McDONOUGH, Chief Justice.

I concur in that portion of the opinion of Mr. Justice PRATT which determines that the act in question is not violative of Section 4 of Article I of Constitution of the State of Utah. I add to what is said in such opinion these observations: Since there are before us no facts ■ which reveal that the Daughters of the Utah Pioneers is an ecclesiastical organization or that it is engaged as an organization in propagating the Mormon faith or that it would use the building for such purposes, we are not at liberty to infer such facts or assume such objective. Furthermore, should it subsequently appear, in light of facts not now before us, that one of the purposes of the organization is that of proselyting, or that such has subsequently become one of its objectives or that the building is being used for such purpose, then an implied condition of the legislative enactment and of the lease made pursuant thereto, would be

violated. That implied condition is contained in Article I, Section 4 of the Constitution. It, of course, would have to be read into the law and the lease in order to sustain the provisions of the one and the terms of the other.

Consequently, should such violation transpire, the lease could, without question, be terminated by the legislature without infringing upon the contract clause of the Constitution of the United States. Likewise, this court could, and undoubtedly would, restrain the use of the building by the Daughters of the Utah Pioneers in such circumstances.

The foregoing observations might not have applied to the act of 1941, set out in the opinion of Mr. Justice PRATT. Thereby, a simple lease of land for a consideration therein stated was to be made to the Daughters upon which land was to be constructed a building by them and for their purposes. But by the subsequent amendments, the building was to be built by the State—the legislative appropriations made total approximately four-fifths of the contract price—for an express public purpose. Use of the building for such express purpose as well as its use in conformity with the implied constitutional provision referred to above is required by any lease entered into, whatever its express terms.

Diverting for a moment to the lease executed June 5, 1941, and quoted in the opinion of Mr. Justice PRATT, such lease is, in the opinion of the writer, presently ineffective. The lease was executed pursuant to Chap. 106, Laws of Utah 1941, which, previously shown, contemplated the erection of a Pioneer Memorial Building by the lessee, which contemplated plan was radically changed subsequently to the execution of the lease, and which provided terms inconsistent therewith. Under the provisions of Chap. 128, Laws of Utah, 1945, a deposit of $75,000 by lessee rather than the sum of $50,000 provided in the lease is required. Furthermore, the lease obligates the lessee to construct the building solely at its own expense, while the 1945 and 1947 acts provide that the lessor furnish several times the amount

which the lessee is required to deposit. The amendments clearly contemplated the execution of a lease subsequent to their enactment.

Is the legislation in contravention of Sec. 23, Article VI of the Constitution of Utah? I am of the opinion that it is not. The somewhat devious course by which the objective of erecting a memorial building was pursued in the several legislative sessions was such as to give pause before concluding that the intendment of such provision was not violated. But if in the final analysis we do find here an act which contains only one subject and find the subject clearly expressed in the title, then we must conclude that its enactment does not violate such provision.

Viewing the several enactments as a whole—the Act of 1941 and the amendments of 1943, 1945 and 1947—the provisions thereof pertain to only one subject. The word "subject" is not synonymous with "provision." Many provisions may be necessary to effectuate the single object of an enactment. 1 Sutherland Statutory Construction, 3rd Ed., Sec. 1710, p. 301. Had the total legislation been enacted at one time, then the subject of the act would be the erection of a pioneer memorial building to house pioneer relics, documents and historical data relating to the life and work of the Utah pioneer. The provisions of such enactment dealing with the leasing of the building, the purchase of additional real estate if necessary, and making an appropriation to effectuate the objective of the legislation are clearly germane to the subject. Hence, there is no duplicity of subject-matter. See *Edler* v. *Edwards,* 34 Utah 13, 95 P. 367.

Furthermore, such subject is expressed in the title, within the meaning of the invoked constitutional provision. It may be conceded that had the legislature in 1945 attempted to change the body of the act by including therein the provision making an appropriation without amending the title, the added matter would be of no effect because violative of Sec. 23, of Article VI of the constitu-

tion. But the title of the act was amended in 1945 so as to include therein and call attention to the fact that an appropriation was provided for in the act. To the effect that where an amendatory act adds new matter to the original act but likewise amends the title of the original act so as to embrace such matter, a constitutional provision requiring the subject to be clearly expressed in the title of an act, is not violated, see *O'Donnell* v. *Powell,* 9 Cir., 282 F. 1. And see 1 Sutherland Statutory Construction, 3rd Ed., p. 347, and cases cited under note 12.

The remaining constitutional grounds cited by plaintiff as requiring the issuance of the writ prayed for, remain to be considered. Is the law as it stands violative of Article I, Sec. 23, Constitution of Utah, which prohibits the legislature from granting irrevocably any franchise, ■ privilege or immunity; or of Article VI, Sec. 26, which prohibits the enactment of any private law granting any privilege, franchise or immunity? Incidentally involved and perhaps implicit in the constitutional provision is the implied constitutional limitation on the legislative power to enact irrepealable laws. This limitation and the reason therefore are well expressed in the following quotation from 1 Cooley's Constitutional Limitations, 8th Ed., p. 246:

" Similar reasons to those which forbid the legislative department of the State from delegating its authority will also forbid its passing any irrepealable law. The constitution, in conferring the legislative authority, has prescribed to its exercise any limitations which the people saw fit to impose; and no other power than the people can superadd other limitations. To say that the legislature may pass irrepealable laws, is to say that it may alter the very constitution from which it derives its authority; since, insofar as one legislature could bind a subsequent one by its enactments, it could in the same degree reduce the legislative power of its successors; and the process might be repeated, until, one by one, the subjects of legislation would be excluded altogether from their control, and the constitutional provision that the legislative power shall be vested in two houses would be to a greater or less degree rendered ineffectual."

I conceive that the cited provision of the constitution relative to franchises and privileges means to ■

apply this general limitation to a particular field. Irrepealable and irrevocable are synonymous.

With the enunciated principle in mind I address myself to what is granted by lease for 99 years. Under such a grant

"during the existence of the lease the tenant is the absolute owner of the demised premises for all practical purposes for the term granted, the landlord's rights being confined to his reversionary interest * * * With the exception of a contrary provision in the lease, and with certain other exceptions, the lessee has the sole and exclusive right to the occupation and control of the premises during the term, and the landlord has no authority during the term to enter or otherwise disturb the tenant in his occupancy and enjoyment." 32 Am. Juris., Landlord & Tenant, Sec. 76, p. 89.

Such, I assume, was the estate in the land in question which it was the intention of the legislature to convey by the act of 1941. It was a lease of the land in question to a private corporation for its own use. And assuming no inhibition upon the legislature which would preclude its sale or its disposal otherwise—and none is suggested by applicant—there is no reason why it might not grant a lesser estate therein.

But the amendatory act of 1945 changed radically the nature and objectives of the legislation. The building is by such act to be constructed *by the State for a specified public Purpose*. It is this fact which brings into focus the question of tying the hands of future legislatures with respect to the use and control of public property dedicated to a public purpose. Should it not be held that implicit in the grant of the legislature is the reserved right of the law making body to determine in the future in its discretion whether the public purpose enunciated in the act is being carried out by the custodians of the building, we would be, in my opinion, face to face with irrepealable legislation. I make this observation aware of the fact that one exception to the general rule as to irrepealable laws is that a state through its legislature may make an irrevocable grant to a private individual or corporation which when

constitutionally granted is protected by Section 10 of Article I of the Constitution of the United States. The point is that if the grant here be so construed as to preclude future legislatures from determining whether the public purpose for which the grant is made is being properly carried out, it is violative of the provisions of the constitution cited at the outset of this discussion. But since the law can be constitutionally construed as not abrogating such legislative power, I am constrained to concur with the majority in so construing it.

Further, there is in my opinion, an additional reason why the writ of prohibition should not be granted. If the law in its final form is construed—and the majority of the court have so construed it—as evidencing as the paramount purpose of the legislature the erection of a pioneer memorial building by the State and only incidentally to put such structure in the hands of the Daughters of the Utah Pioneers for the custody and control thereof, then the provision leasing the structure to the Daughters is clearly severable from the provisions relating to the erection of the building. In such situation, if it is reasonable to find that the legislative intent is to erect the building itself then, though the lease to the Daughters be held invalid, we are required to give effect to that intent, and hence to refrain from placing a restraining hand on its consummation. For the reasons stated, I am of the opinion that the writ should be denied.

LATIMER, Justice.

I concur in the first part of the opinion of Mr. Justice PRATT which deals with the constitutionality of the act when it is tested by the constitutional restrictions of appropriating money for the support of an ecclesiastical establishment or order. I disagree with the latter portions of the opinion which hold (a) that the legislative enactment contravenes the constitutional provisions which prohibit

the granting of privileges, immunities or franchises, and (b) that the various statues involved in this litigation violate the constitutional provisions with respect to the enactment of statutes containing more than one subject.

It may be that I approach the problem too greatly influenced by those legal concepts which require that this court uphold the constitutionality of an act if reasonably possible. The members of this court have, on many occasions, passed on their duty to uphold an act of the legislature, and while it would be the work of supererogation to cite the many cases dealing with this subject, I quote from one of the more recent opinions. Mr. Justice Folland in the case of *State* v. *Packer Corporation*, 77 Utah 500, 297 P. 1013, 1016 announces the rule to be as follows:

"It is well settled in this state, as elsewhere, that the courts will not dclare a statute unconstitutional unless it clearly and manifestly violates some provision of the Constitution of the state or of the United States. Every presumption must be indulged in favor of the constitutionality of an act, and every reasonable doubt resolved in favor of its validity. *Utah State Fair Ass'n* v. *Green*, 68 Utah 251, 249 P. 1016. The whole burden lies on him who denies the constitutionality of a legislative enactment. *Brown* v. *Maryland*, 12 Wheat. [419], 436, 6 L. Ed. 678. If by any fair interpretation of the statute the legislation can be upheld, it is the duty of this court to sustain it, even though judges may view the act as inopportune or unwise; and it is not within the province of the judiciary to question the wisdom or the motives of the Legislature in the enactment of a statute. *{Utah State Fair Ass'n* v. *Green*, supra. The provision in question was regularly passed by the Legislature and approved by the Governor. The presumption should be and is in favor of validity. It must be assumed that the legislative department, whose members pledged themselves by oath to support the Constitution, has not lightly disregarded that pledge."

A reading of the dissenting opinions causes me to ponder whether or not the dissenting members have not overlooked this principle and found a way to condemn the act rather than to have found a way to uphold it. Many of the objections made to the plan by Mr. Justice PRATT appear to

me to be founded on the failure to incorporate adequate provisions in the lease to control the lessee.

Over the course of years, the work of steering legislation through the various sessions of the legislature has required the joint efforts of the members of the Daughters of Utah Pioneers, Inc. and the members of the legislature. The personnel has changed over the years and, as a result, the various pieces of legislation when fitted together do not make a clear and definite picture. Our concern, however, is not whether the legislation is a model of clarity, but rather whether or not the legislation is sufficient to overcome the constitutional objections raised by the plaintiff. Even though the various acts are incomplete, if the legislation is not so indefinite and uncertain as to offend against the constitutional provisions, then the appropriation as made by the legislature is not in excess of its authority. If the appropriations are offensive and contrary to the constitutional provisions, it must be because they make funds available for private purposes and not because of the sufficiency or insufficiency of a lease, the terms of which are in part dictated by legislative enactments.

As outlined in Mr. Justice PRATT's opinion, the efforts to construct a memorial building to house pioneer relics commenced many years ago; however, the first act of the legislature with which we are concerned was passed in 1941. In view of the fact that this act is the starting point in the legislative history of the building of this memorial, I quote the same in full with the exception of the description of the property leased, Chapter 106, Laws of Utah 1941, p. 225:

"Lease Of Land To Daughters Of Utah Pioneers

"An Act Leasing Certain State Capitol Real Estate Known as the Triangle to the Daughters of Utah Pioneers, Incorporated, for the Erection and Maintenance of a Pioneer Memorial Building to be Used for the Preservation, Housing and Care of Historical Records, Pioneer Documents and Relics Relating to the Life and Work of the Utah Pioneers.

"Be it enacted by the Legislature of the State of Utah:

"Section 1. Lease of Land to Daughters of Utah Pioneers—

Description.

"The state land board is authorized and directed to execute in writing and deliver to the Daughters of Utah Pioneers, Incorporated, a non-pecuniary corporation, organized and existing under and by virtue of the laws of the state of Utah, a lease covering certain land, situated in Salt Lake County, state of Utah, lying between Columbus and North Main streets at the southwest corner of the capitol grounds, and more particularly described as follows, to wit: (Description omitted)

"Section 2. Term of Lease.

"The lease shall run for a period of ninety-nine years from the date of its execution and delivery at a rental of One Dollar per year, payable annually to the state treasurer on the first day of March of each year, commencing with the year 1943.

"Section 3. Lessee to Deposit $50,000—Use of Money—Completion of Building.

"The lease shall be subject to the following conditions: The lessee, the Daughters of Utah Pioneers, Incorporated, shall deposit with the state treasurer the sum of fifty thousand dollars, not later than February 1, 1943, as evidence of its ability to carry out a building project. Said sum, with other funds is to be used in the erection of the building. It is further provided that the Pioneer Memorial Building shall not be subject to taxes or liens of any kind whatsoever.

"The building shall be completed and ready for public reception before the Utah state centennial celebration, which will be held in the year 1947.

"Section 4. Failure to Perform—Termination.

"Failure on the part of the lessee, Daughters of Utah Pioneers, Incorporated, to perform the foregoing conditions will automatically terminate the lease."

A cursory reading of this act will convince the reader that at the time of its enactment the intent of the legislature was to lease the land to the Daughters of Utah Pioneers, Inc., and require that organization to construct a building on the premises. It should be noted that with the exception of the title of the act, no reference is made to the purpose for which the building is to be constructed. The title provides for the erection and maintenance of a Pioneer Memorial Building to be used for the preservation, housing and care of historical records, pioneer documents and relics relating to the life and work of the Utah pioneers. The body of the act, however, merely provides that the $50,000 deposited by the

Daughters of Utah Pioneers, Inc., together with other funds is to be used in erecting a building. The significant parts of Section 3 of the act are that the pioneer memorial building shall not be subject to taxes or liens of any kind whatsoever and that it shall be completed before the Utah state centennial celebration. Obviously these provisions would be unnecessary if the building were not to be constructed by the Daughters of Utah Pioneers, Inc.

Pursuant to Chapter 106, Laws of Utah 1941, a lease of the land was executed by the state land board. This lease is set out in full in Mr. Justice PRATT'S opinion and certain parts considered of importance are italicized. It will be observed that the state land board in preparing the lease included items which were not included in the act as passed by the legislature and neglected to include many of the usual provisions included in standard leases.

The first amendment of any importance was enacted by the legislature in 1945. This act as finally passed became Chapter 128, Laws of Utah 1945, and it amended the previous acts passed by the 1941 and 1943 legislatures. The act as introduced was so altered and amended by the 1945 legislature as to indicate an intention to relieve the lessee, Daughters of Utah Pioneers, Inc., of the duty of constructing the building and to place this responsibility on the state of Utah. The act was introduced in the senate as senate bill No. 13, and following is the wording of the senate bill as presented:

"An Act Amending Section 86-1-48.12, Utah Code Annotated 1943, as Amended by Chapter 95, Laws of Utah, 1943, Relating to the Leasing of a Portion of the State Capitol Grounds to the Daughters of the Utah Pioneers, Inc., for the Purpose of Erecting a Pioneer Memorial Building and the Purchase of Additional Lands and Making an Appropriation.

"Be it enacted by the Legislature of the State of Utah:

"Section 1. Section Amended.

"Section 86-1-48.12, Utah Code Annotated 1943, as amended by Chapter 95, Laws of Utah, 1943, is amended to read:

"86-1-48.12. Conditions of Lease.

"The lease shall be subject to the following conditions: The lessee, the daughters of the Utah pioneers, inc., shall have available for immediate use the sum of $75,000.00 or its equivalent, in United States or Utah state bonds not later than February 1, 1946, as evidence of its ability to carry out a memorial building project. Said sum, with other funds, is to be used in the erection of the pioneer memorial building, for the purpose of depicting the history of Utah in a proper display of pioneer relics; and for the purchase of additional land in the name of the state of Utah in the event such purchase is consented to in writing by the governor. It is further provided that the pioneer memorial building and contents thereof shall not be subject to taxes, liens or assessments of any kind whatsoever. The erection of said pioneer memorial building shall be commenced *when the governor shall determine that labor and materials are available, and that the best interests of the state will be served.*

"Section 2. Appropriation.

"There is hereby appropriated to *the Utah state building board* out of any unappropriated funds in the general fund the sum of $225,000.00 to be used toward the construction of the said memorial building and for the purchase of additional land adjacent to the said capitol grounds in the event the governor shall consent in writing to such purchase. Provided, however, that no portion of the said $225,000.00 shall be used until the daughters of the Utah pioneers, inc., shall have deposited with the state treasurer the sum of $75,000.00, or its equivalent, in United States or Utah state bonds, *and provided that the funds herein appropriated shall be available only to the extent that may be required to supplement the funds of the daughters of Utah pioneers, inc., and any federal funds that may become available for such construction. All unexpended balances of any moneys appropriated by this act shall be turned over to the state treasurer for the credit of the Utah state building board for the purposes herein specified.*" (Italics mine.)

The changes between the bill as introduced and the act as finally passed are significant and are indicated by the italicized words and phrases. Section 2 of the bill as introduced provided for an appropriation of $225,000 to the Daughters of Utah Pioneers, Inc., out of any unappropriated funds in the general fund to be used for the construction of a building and for the purchase of additional grounds. When the bill was considered in the senate, Section 2 was amended so that the money was not appropriated to the Daughters of Utah Pioneers, Inc., but was appropriated to the Utah

State Building Board. The provisions that the funds therein appropriated should be available only to the extent that might be required to supplement the funds of the Daughters of Utah Pioneers, Inc., and any federal funds that might become available for such construction, and that all unexpended balances of any monies appropriated by the act should be turned over to the state treasurer for the credit of the Utah State Building Board were written into the bill by amendments. The sentence in the proposed bill dealing with the time for commencement of construction was amended so as to provide that the building should be commenced when the governor should determine that labor and materials are available and the best interests of the state would be served. For the first time in the body of the act is found a provision with respect to the purpose of the building. In the 1945 act, the funds are committed to be used in the erection of a pioneer memorial building for the purpose of depicting the history of Utah in a proper display of pioneer relics.

These changes by the legislature lead me to believe that the plan as contemplated by previous legislatures was found not to be feasible and that the legislature determined in 1945 that if a memorial building was to be constructed, the state would be required to advance the major portion of the money. It must be conceded that when the legislature changed the plan from that which provided for, or anticipated the construction of the building by the Daughters of Utah Pioneers, Inc., to that which proposed a construction of the building by the state of Utah, it did not delete from senate bill No. 13 some of the provisions which were considered necessary if the building was to be constructed by the Daughters of Utah Pioneers, Inc. Illustrative of this is the provision in the bill as proposed and the act as finally passed making reference to taxes, liens and assessments on the building and its contents. This provision might be necessary if the building were to be constructed by the Daughters of Utah Pioneers, Inc., but only taxes on the contents would

be of any importance if the building were to be constructed by the State of Utah. The provision with respect to the purchase of additional lands and consent to the purchase by the governor might be a necessary provision if the money were appropriated to the Daughters of Utah Pioneers, Inc., and the land was to be purchased by the corporation in the name of the state of Utah, but it is hardly necessary to require the governor to consent in writing if the land is to be purchased for the state of Utah with money belonging to the state of Utah.

These inconsistencies are pointed out solely for the reason that references are made in Mr. Justice PRATT'S opinion to some of these items and others which it is claimed establish that the building is being constructed for the Daughters of Utah Pioneers, Inc. To strengthen this contention, his opinion refers to other items such as approval of a plot of land by the lessee, seal of the Daughters of Utah Pioneers, Inc., inside the building, and certain other facilities such as office space and kitchen. In my opinion these items are not inconsistent with a lessee-lessor relationship, and those portions of the act which may be inconsistent with state ownership of the building are in the act because of the change in the plan made by the 1945 legislature. The senate bill as introduced was written with the old plan in mind, and the act as finally passed by the legislature was on the newly conceived idea. The most that I think can be claimed for the inconsistencies in the provisions of the act is that the legislature neglected to delete some items which would have been important had the Daughters of Utah Pioneers, Inc., constructed the building, but are of no importance now that the state is the owner and the builder.

Before considering some of the authorities that deal with the public purpose principle of this problem, I believe it appropriate to dispose of the contention that the acts are fatally defective because the Daughters of Utah Pioneers, Inc., is not adequately controlled in the man-

agement of the memorial building. As far as I have been able to ascertain, the only lease executed by the Daughters of Utah Pioneers, Inc. is the one referred to in the majority opinion, and this was executed on the 5th day of June, 1941. Subsequent legislatures have made important modifications and many changes to the act of 1941 and have imposed additional conditions upon the lessee. The modifications have been of such materiality and importance that I have grave doubts that any enforceable lease now exists between the state of Utah and the Daughters of Utah Pioneers, Inc. I mention this at this point for the purpose of suggesting that if the terms of the original lease do not give the state of Utah sufficient control over the lessee so as to require it to properly operate the building as a memorial for the appropriate display of pioneer relics, then, in my opinion, the state of Utah has every right and reason to require the execution of a proper lease based on the terms and conditions of the 1945 act. A lease founded on the later act can require the lessee to display not only relics belonging or loaned to it, but any and all relics of the early pioneers. The lease could further require the lessee to maintain such opening and closing hours and such display of exhibits as would be required to properly serve public purposes.

Regardless of whether or not the lease of 1941 is a valid and subsisting lease, I believe the appropriations for building the structure can be sustained. Cooley on Taxation, 4th Ed., par. 184, provides as follows:

"Private agency as affecting purpose. So far as a public purpose is concerned, the nature or character of the person natural or artificial, through whom or by whom the proceeds of the tax is to be applied or used, is immaterial. If the purpose is public, it does not matter whether the agency through which the money is dispensed is public or private, since the appropriation or tax is not made for the agency but for the object which it serves. The right to tax 'depends upon the ultimate use, purpose and object for which the fund is raised, and not on the nature or character of the person or corporation whose intermediate agency is to be used in applying it. A tax for a private purpose is unconstitutional, though it pass through the hands of public officers, and the people may be taxed for a public

purpose, although it be under the direction of an individual or private corporation.' "

In the case of *Hager* v. *Kentucky Children's Home Soc.,* 119 Ky. 235, 83 S. W. 605, 608, 67 L. R. A. 815, the court of appeals of Kentucky upheld the constitutionality of an act which appropriated $15,000 annually to a private corporation organized under the laws of that state for charitable purposes and conducted solely to seek out destitute children and provide homes for them. The court announced the following principle:

"These authorities clearly settle that the vital point in all such appropriations is whether the purpose is public; and that, if it is, it does not matter whether the agency through which it is dispensed is public or is not; that the appropriation is not made for the agency, but for the object which it serves; the test is in the end, not in the means. The limitation put upon the state government by the people is as to what things it may collect taxes from them for, to which it may apply their property through taxation; not upon the means by which or through which it will do it. It may well and wisely be left to the Legislature to say how it will dispense the state's charities."

The case of *State ex rel. Trustees of La Crosse Public Library* v. *Bentley,* 163 Wis. 632, 158 N. W. 306, deals with the question of unconstitutionality of an act because the corporation that administered the affairs of a library was a private corporation. The test applied by the court in that case in determining whether or not a particular agency might be employed by the state to perform the particular work was not whether the operating agency was public, but whether the purpose for which the agency was employed was public. The court there held that the purpose was public and the agency selected by the state was an appropriate one for the administration of such purpose through which the purposes could be accomplished. The reasoning in that case seems to me to be persuasive in the present situation. The construction and maintenance of a museum for the purpose of displaying pioneer relics is a public purpose and the Daughters of Utah Pioneers,

Inc., is an appropriate agency to be trusted with the duties of carrying out the purpose. As long as the act does not prohibit that organization from so acting, then we should not invalidate the act because we believe the agency selected by the legislature is not an appropriate one.

In *Conley* v. *Daughters of the Republic of Texas,* Tex. Civ. App., 151 S. W. 877, 881, the court of civil appeals held that an act which gave to the Daughters of the Republic of Texas, a private corporation, the exclusive care and custody of the Alamo property owned by the state and which placed the corporation in the exclusive and absolute control of the property was constitutional. The following quotation is extracted from that case:

"The title to the Alamo property is in the state of Texas and it alone has the right and authority to place the possession, control, and custody of it in the hands of another; such permission to control and possess being expressed through its only medium of expression, in such case, the legislative branch of the government. It alone can legislate, and to it and the Constitution of the state the other branches of the government must look for power, guidance, and authority. Within constitutional limits its power in the enactment of laws is supreme."

In the case of *Furlong* v. *South Park Com'rs,* 340 Ill. 363, 172 N. E. 757, 759, the Supreme Court of Illinois held that the park commissioners' agreement to allocate a public building to a non-profit museum corporation was not invalid. I quote from that portion of the opinion dealing with the right of a non-profit corporation to be the operating agency for the municipal government:

"In answer to appellant's contention that the ordinance and agreement of the park commissioners constitute a donation or loan of credit to the museum corporation, appellees state that the benefits accruing to the park commissioners and the public greatly outweigh any benefits accruing to the museum corporation. The museum corporation is not a corporation organized for profit. It has no stock, and no member of the corporation can receive any dividends. Appellees cite *St. Hedwig's [Industrial] School* v. *Cook County,* 289 Ill. 432, 124 N. E. 629, and *Maffit* v. *City of Decatur,* 322 Ill. 82, 152 N. E.

602, that the exchange of one thing for another does not constitute a donation or loan of the municipality's credit. In *Bullock* v. *Billheimer*, 175 Ind. 428, 94 N. E. 763, it was urged that the appropriations involved were invalid as providing aid to private corporations. The court denied the claim and said the associations were not organized for pecuniary profit, but for public purposes, and that the test was not the means employed but the use or object sought."

I believe the foregoing quoted cases announce good law, and even though the legislature, when it authorized the leasing of the property to the Daughters of Utah Pioneers, Inc., may have preferred that organization, such a preferment under the facts in this case, was within the legislative authority. It matters not to whom the state leases the property; the lessee would have certain rights not possessed by other similar organizations. Any tenant of the property would have the right of occupancy, and this, of necessity, carries the right to use the facilities of the government. I know of no other organization that is interested in assuming part of the costs of operating this property, and if the state of Utah has been fortunate enough to find an organization which is willing to assume part of the costs of exhibiting the relics, and the members of the organization have sufficient interest to devote their efforts to a public purpose, I am unable to determine why we should deny the state the benefit of the contributions of both money and services. The corporation is only the operating agency employed by the state and not the objective of the statutory provisions. The objective sought by the legislature is a proper display of relics. The use of the corporation as a means to this end should not defeat the act.

If the state can choose an operating agency to carry out a project, then this brings our problem of public purpose into focus. No one can deny that the state may venture into those activities which are definitely impressed with public purpose, and, surely, this court is not prepared to say that constructing a building to house and exhibit relics of the past is not so impressed.

Generally speaking, the reasonable use of public money for the construction and maintenance of memorial buildings designed to inspire respect and admiration for the memory of worthy individuals or classes of individuals is for a public purpose and within the power of ■ the state. In support of this proposition I again refer to those cases previously cited in this opinion. *Hager* v. *Kentucky Children's Home Soc.*, supra, holds that appropriations made to an organization conducted for the benefit of destitute children was for a public purpose. *LaCrosse Public Library* v. *Bentley*, supra, held that the appropriation to the trustees of a library was expending money for a public purpose. *Conley* v. *Daughters of the Republic of Texas*, supra, held that appropriations for support and maintenance of a building to perpetuate the memory and spirit of men and women who helped achieve the independence of Texas was for a public purpose. *Furlong* v. *South Park Com'rs*, supra, held that an appropriation for the restoration of a fine arts building and its operation as an industrial museum was for a public purpose.

An Annotation found in 30 A. L. R. 1029 is referred to in Mr. Justice PRATT'S opinion as being excellent, but the case preceding the annotation is not discussed. That is the case of *Allied Architects' Ass'n* v. *Payne*, 192 Cal. 431, 221 P. 209, 212, 30 A. L. R. 1029. That ■ case involved the erection of a memorial building to symbolize the soldiers' spirit of sacrifice. The use of the building was limited to organizations of veterans. The California Supreme Court held that the erection of a building as a memorial to soldiers and permitting its use only by organizations of veterans was not in violation of the constitution of the state of California. Mr. Justice Lennon stated the following:

"It may be fairly said in the instant case that the benefit conferred is but incidental to the paramount purpose contemplated by the statute and is in and of itself inconsequential. The main object of the statute should not be circumvented and condemned because some

mere incidental and inconsequential benefit may be derived from the operation of the statute."

An early United States Supreme Court case, *United States* v. *Gettysburg Electric R. Co.,* 160 U. S. 668, 16 S. Ct. 427, 429, 40 L. Ed. 576, held that an appropriation for the acquisition of land for the preservation of an historic spot as a perpetual monument to those who had risked or lost their lives was an appropriation for a public purpose. Mr. Justice Peckham speaking for the court said:

"Any act of congress which plainly and directly tends to enhance the respect and love of the citizens for the institutions of his country, and to quicken and strengthen his motives to defend them, and which is germane to, and intimately connected with, and appropriate to, the exercise of some one or all of the powers granted by congress, must be valid. This proposed use comes within such description. The provision comes within the rule laid down by Chief Justice Marshall, in *McCulloch* v. *Maryland,* [17 U. S.] 4 Wheat 421 [4: 605], in these words: 'Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adequate to that end, which are not prohibited but consistent with the letter and spirit of the constitution, are constitutional.' "

There are three decisions relied on by other members of the court which I do not believe to be contrary to the principle I announce. In the case of *Frohliger* v. *Richardson,* 63 Cal. App. 209, 218 P. 497, the district court of appeals, District No. 1, of the state of California held that a legislative act appropriating $10,000 for the restoration of a San Diego mission was unconstitutional. While the court deals with the importance to the state of California of the history of the Franciscan missions, the act was held invalid as not being for a public purpose. The difference in the facts of the two cases makes the rule announced by the California court in that case of no material help. At the time of the passage of the appropriation bill, the mission at San Diego had been and was owned and controlled by the Roman Catholic church and the same was being used for religious purposes by that church. At no time was it being conducted

for the benefit of the public or for the support or maintenance of children or aged persons in necessitous or indigent circumstances. The court concluded that while the California missions were of historical and educational interest from a religious, cultural, and literary standpoint, they were being used solely and exclusively for ecclesiastical purposes and consequently did not approach such classification as would make them the subject of a legislative appropriation in the guise of public interest, public good, or public welfare. Under a similar state of facts the law as announced in that case would be applicable here. I respectfully suggest that if our legislature appropriated money to rehabilitate the Mormon Tabernacle that such an appropriation would contravene the provisions of our constitution. That, of course, is not the problem that now confronts us.

An attempt is made to distinguish the case of *State ex rel Trustees of LaCrosse Public Library* v. *Bentley,* 163 Wis. 632, 158 N. W. 306, by making reference to the purposes set forth in the articles of incorporation of the public library. I can see no good reason for concerning ourselves with the fact that the articles of incorporation of the Daughters of Utah Pioneers, Inc., do not expressly provide that exhibits shall be received from all and displayed for the benefit of the people of the state of Utah. The important document, in my opinion, is the lease. If the state of Utah can, as lessor, require the Daughters of Utah Pioneers, Inc., to appropriately receive and properly display the exhibits for the benefit of the people of this state, then the wording of the articles of incorporation is immaterial. The members of the corporation might amend the articles and defeat this purpose, but they could not amend the terms of the lease.

Another case cited in the majority opinion is *Kingman* v. *City of Brockton,* 153 Mass. 255, 26 N. E. 998, 11 L. R. A. 123. This case seems to me to be consistent with the theory for which defendants contend. The Massachusetts state legislature authorized the city to appropriate

money for the erection of a memorial hall to be used and maintained as a memorial to soldiers and sailors. The legislative act was held constitutional. An ordinance adopted by the city was held invalid because it reserved part of the hall for a particular G. A. R. post. That case presents an entirely different picture from the one I see in the present action. If we assume the state is constructing a building to be operated by itself and has reserved part to the Daughters of Utah Pioneers, Inc., for its own private purposes and to the exclusion of the public, then the cases would be parallel and our act might not be sound. Under that state of facts, the Daughters of Utah Pioneers, Inc., would be no more entitled to free accommodations than would any other eleemosynary or nonprofit corporation. However, when the state has selected an operating agency to manage and control the exhibition for the use and benefit of the state, there is no constitutional prohibition against the organization having office space for the purpose of carrying out the functions delegated to it by the state. If a public corporation can be used by the state for supervising the memorial building, and for this purpose can have access to the whole of the building, I cannot understand why it could not legally occupy part.

In the present action the benefit to be derived from the construction of a pioneer memorial building should not be circumvented and condemned because the Daughters of Utah Pioneers, Inc., may derive some incidental and inconsequential benefit. If the nature of an appropriation can be determined by inquiring into the use of the funds, then there can be little question that the display of pioneer relics is a public purpose. For the people of this state to see the inadequate weapons, tools, equipment, household belongings, and means of conveyance of the early pioneers should impress indelibly on their minds the courage, determination, endurance, foresight of and sacrifices by the early settlers of this state. The erection of a building as a memorial hall to extoll their deeds and to influence

future citizens of this state to struggle under adversity for the betterment of themselves and the state is truly a public purpose and should be respected by this court as such.

Even were there doubts in my mind that the appropriation was for a public purpose, I would be inclined to follow those authorities which hold that the determination of what is and what is not a public purpose belongs in the first instance to the legislative department; and that while the legislative determination is not absolutely conclusive, there is a presumption in favor of the validity of the act. An appropriation should be considered valid unless it be for a purpose in which the community has no interest, and it is only in a clear case that this court should invalidate legislative enactments because in our judgment a public purpose is not being served.

If I am correct in my premise that the purposes of the act are public and that the state can operate the building through an agency of its selection, then little need be said about the act offending against the constitutional provision prohibiting the granting of a privilege, immunity or franchise to a corporation. Practically all the cases I have previously cited have disposed of similar contentions and Mr. Justice PRATT apparently concludes that our act grants the corporation only a privilege. Undoubtedly such a holding would be correct if the act prescribed that the state was to build a building and that only property belonging to the lessee could be displayed. The various legislative enactments do not so provide, and I am of the opinion that the fair inference from the act is contrary to such a construction. To require the building be used for a proper display of pioneer relics negatives the idea that the lessee can arbitrarily exclude any pioneer object which is esteemed or venerated. Further, it is my belief that the state can control the display by and through the terms of its lease or because the corporation is only an operating agent for the state in the proper display of these items, and as such, can be directed by the state. Certainly

both the corporation and the state have assumed that the corporation is subject to legislative control as the conditions of the original pact have been substantially modified by subsequent legislative action.

Conceding the corporation has a right to occupy the property to the exclusion of other tenants, I am unable to subscribe to the doctrine that by leasing the building, the state has granted such a privilege as is prohibited by the constitution. If the constitutional provision is to be so construed then the state could not lease any of its property. Any lessee acquires rights to the exclusion of other people, but that does not prohibit the state from leasing any of its property. In this case if the corporation obtained a privilege, I am convinced it is one that no other organization was willing to accept. It was required to advance $75,000, and if we accept the terms of the original lease, it was required to operate the building and pay all the costs and expenses of operation during the life of the lease. It strikes me very forceably in considering these legislative enactments that the legislature was very definitely acting in the public interest. The benefits of a museum for such purposes are not disputed and the public will receive a substantial sum of money and the efforts of the members of the corporation to maintain a building for the public benefit. I am unable to see how this contravenes that section of the constitution which provides that the state shall not grant a privilege.

The Arizona Supreme Court in the case of *Leatherwood* v. *Hill*, 10 Ariz. 243, 89 P. 521, 523, passed on the question of making an appropriation to a private corporation which was incorporated for the purpose of collecting and preserving information connected with the early settlement and subsequent history of the territory. The language taken from the decision rendered by that court is apropos:

"Neither it nor its officers are being endowed by the appropriation with 'any special or exclusive privilege, immunity, or franchise.' A

privilege, as defined by the Standard dictionary, is 'a peculiar benefit, favor, or advantage, a right * * * not enjoyed by all, * * * a special right or power conferred on or possessed by one or more individuals, in derogation of the general right.' An immunity is 'freedom from duty or penalty.' A franchise is a 'special privilege emanating from the government by a legislative grant, and vested in an individual person or in a body politic or corporate.' This appropriation act imposes a duty. It does not confer a privilege. It furnishes the means for a compilation of data and collection of Arizonana specifically for the benefit of and open to the public and owned by the territory. It does not grant something in derogation of the general right, or to be enjoyed by the few instead of by all. It does not free the society from any duty or penalty. For practical purposes the society becomes a public agency, an executive instrument of the government, a convenient means for accomplishing an end deemed by the Legislature in its wisdom to be useful to the public, an end of a kind which has been generally and frequently promoted by legislative enactments throughout the United States."

In connection with the holding that the act is unconstitutional because it contains more than one subject, I call attention to the following language found in the case of *State* v. *Barlow*, 107 Utah 292, 153 P. 2d 647, 655:

"However, the contention that there is more than one subject in the act in question cannot be sustained. The decisions of this court announce the rule that the legislature may not include matters which are neither related nor germane to one subject; but that the constitutional provision is not to be applied so as to hamper the law-making power in adopting comprehensive measures covering a whole subject, where matters included all have some direct connection with or relation to the principal subject treated; and that the constitutional provision should be so applied as to guard against the real evil which it was intended to prevent. *Utah State Fair Ass'n* v. *Green*, 68 Utah 251, 249 P. 1016; *Edler* v. *Edwards*, supra; *Martineau* v. *Crabbe*, 46 Utah 327, 150 P. 301. See Crawford, Statutory Construction, Sec. 98, and Cooley's Constitutional Limitations, 6th Ed. p. 170, 171."

In dealing with the sufficiency of the title under Article VI, Section 23 it should be kept in mind that in addition to the presumption of constitutionality the objects of this

provision should be considered. The aim of the constitutional provision is to give information as to the subject of the legislation with which the act deals and to apprise the members of the legislature and the people of the subject of the legislation under consideration. The general rule has been announced that the title is sufficient if it is not productive of surprise and fraud and is not calculated to mislead the legislature or the people, but is of such character as fairly to apprise the legislators and the public of the subject matter of the legislation and to put anyone having an interest in the subject on inquiry. See Am. Jur. 50, p. 146, sec. 167.

The original act of 1941 was titled as follows:

"An Act Leasing Certain State Capitol Real Estate Known as the Triangle to the Daughters of Utah Pioneers, Incorporated, for the Erection and Maintenance of a Pioneer Memorial Building to Be Used for the Preservation, Housing and Care of Historical Records, Pioneer Documents and Relics Relating to the Life and Work of the Utah Pioneers."

The amended act of 1945 was as follows:

"An Act Amending Section 86-1-48.12, Utah Code Annotated 1943, as Amended by Chapter 95, Laws of Utah, 1943, Relating to the Leasing of a Portion of the State Capitol Grounds to the Daughters of the Utah Pioneers, Inc., for the Purpose of Erecting a Pioneer Memorial Building and the Purchase of Additional Lands and Making an Appropriation."

Whether we consider these acts individually or together, both include sufficient information to meet the standards required by the constitutional amendment. The subjects included in the act are germane to the purposes to be accomplished and the title would apprise anyone of the subject matter of the statute.

Chapter 122, Laws of Utah 1947, is not in conflict with the quoted section of the constitution for the reason that it is a general appropriation bill and meets the requirement of the constitution.

For the foregoing reasons I am of the opinion that the alternate writ should be quashed and the petition dismissed.

WADE, J., concurs in the opinions of McDONOUGH, C. J., and LATIMER, J.

WOLFE, Justice (dissenting).

I dissent but since my conclusions rest largely on different grounds than do those of Mr. Justice PRATT I shall state the reasons for my dissent. I desire first to express my regret that this petition for a writ of prohibition was not brought in the District Court where evidence could be adduced. I find myself without the benefit of such information as could be adduced by a trial court with its facilities for taking evidence and for cross-examination. We are thus handicapped. The method of obtaining evidence piecemeal by stipulation when five judges are involved is very unsatisfactory, especially in a case where there is a demand for expedition. There is no reason why the questions now before us in this matter could not earlier have been litigated first in the lower court either by declaratory judgment proceedings or otherwise instead of waiting until the contract was let and the contractors had started excavation and incurred expense. However, I believe my conclusions rest on submitted evidence together with historical facts of general knowledge in this state of which we can take judicial notice, and on inferences which fairly flow from such submitted evidence and the facts of which we may take judicial notice.

I have no doubt that the care, preservation and display of the relics of the pioneers is a public purpose. *Ordinarily* where the purpose for which the money is appropriated is a public one the nature of the agency chosen by the legislature to dispense moneys for the public purpose will not in *most cases* affect the constitutionality of the tax or the appropriation. Should the money be, by the agency chosen, diverted from a public to a private purpose, it is thought

that a remedy to prevent such diversion may exist by injunction or the agency and those responsible for the diversion be made to account. But power to use non-public agencies for execution of a public purpose may, under certain circumstances, be limited by the requirement of Section 4, Article I of our State Constitution reading

"* * * No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction * * *."

To this I shall later advert.

I do not think that Chapt. 106, Laws of Utah 1941, nor any of its amendments offend against Sec. 23 or 26 of Article VI of our Constitution nor against Sec. 1 of Article XIV of the Constitution of the United States.

In many respects this case is sui generis. I shall postpone to a subsequent place in this opinion the factors which make it so and which differentiate it from all of the cases cited by defendants. We do not need to discuss the question here whether the care and display of relics or paraphernalia belonging to a former period is itself a public purpose. I can conceive that there may be educational value in a display of ladies' apparel of past periods, such as the bustle and hoop skirt in that they are marks of a past and different culture and therefore of use to the historian. Historical manuscripts and documents which throw light on the thought and problems which were of general concern in bygone periods gives us a glimpse into the detailed history of those periods and permit us to live imaginatively in that past. What is of historical or educational value as to past cultures, the care and preservation of which is of public concern, is largely for the legislature. The preservation of the homes of our national heroes and their appointments as national shrines for the education and inculcation of patriotism is conceded to be a public purpose. While it is a little difficult to see how a view of the bed in which Washington slept at Mount Vernon or the

sight of a pair of his boots or his shaving mug would kindle within us a warm appreciation of his heroic deeds or his services to his country, there may be some transference of thought from them to their owner and hence to his life, deeds and character. And that brings us to the heart of the real purpose of veneration of those to whom future ages are indebted for the enrichment of their lives. When we venerate the man we do not do so because he was a mortal but because of his life, his deeds, his character and his achievements. And while I am convinced that military heroes have too much "stolen the show" and that all those whose inventions and discoveries, whose toil and production, whose sacrifices and work, whose lives and activities have been devoted to the public good—the peace heroes—are in many cases even more entitled to our plaudits than are the military heroes, I recognize that their less dramatized contributions to future generations will have to await a more discriminating public. So much for some general observations.

Admitting that what is a public purpose may lie with the legislature, subject perhaps to a review for arbitrariness, and of course subject to a review as to the question of whether the method of executing the purpose falls athwart the restrictions of Sections 4 and 23 of Article I and other germane provisions of our Constitution, whether we are Mormon or non-Mormon in our religious persuasions, we have no doubt that the deeds, character, lives and achievements of the pioneers who made the long trek and endured the hardships and the toils and disappointments and whose devotion, work and skills converted the desert lands of this region into a habitable area for future generations, deserves the everlasting gratitude of those generations. The preservation and care of those articles, books, manuscripts and documents which serve to remind and rekindle this feeling of gratitude and veneration for the persistence, fortitude, courage, sacrifice, hardihood, faith in the future, vision, determination and other qualities

which, under Brigham Young and other leaders, they so valiantly applied to their task of consecration, is a public purpose. I think it well that measures be taken properly to house these relics and documents. I should add to this appreciation of the character and the accomplishments of the pioneers, a recognition of the great and earnest work which the Daughters of the Utah Pioneers have unstintingly and without material compensation done in collecting and preserving the mementos, relics and documents of that early pioneer culture.

The main opinion discovers that the Mormon pioneers made their great trek in order to establish freedom of religion. I think the history of the Mormon people reveals that they sought an asylum in the remoteness of the west for the purposes of enjoying freedom to worship in their own way without interference. I have gained no impression that the Mormons left their homes in Nauvoo and came to this desert country in order to establish general freedom of religion for all. In fact, I have the distinct impression from my reading of the history of the early days in Utah that gentiles were not welcome in numbers. And for a good reason. If, before the Mormons had thoroughly established themselves and their authority and regime, the gentiles had come in numbers, the result might have meant a second migration and a desertion of the fruits of their toil and hardship to escape what might have been a renewed persecution. There was no guarantee that only sympathetic gentiles would settle among them. The situation was far different when the newcomers were thoroughly established and in position to maintain their numerical superiority and dominant authority. While in small communities there may have continued for a time a suspicion of strangers, and a "show me" attitude may have prevailed, members of all churches were permitted to worship according to the dictates of their consciences and the policy and treatment of members of other faiths approximated that of the Quakers rather than that of the Puritans. I only touch on this because I

think the conception that the great trek—perhaps only paralleled in known history by the march of Xenophon and his ten thousand—was made to establish a place where all could worship freely, would come as a surprise to Brigham Young if he were here. And I mention this not to detract one iota from this epic migration, but because what I shall later say may depend to some extent on a proper conception of the motives and purposes for which the migration was made.

I do not think it vital to determine whether Chapt. 128, Laws of Utah 1945 effected a change of intent from one which contemplated a lease of the triangle piece of ground to the Daughters of the Utah Pioneers (who at times throughout this opinion I shall, for the sake of brevity, refer to as the Daughters) and their construction on it *by them* of a Pioneer Memorial Building to one which contemplated a lease to the Daughters and the erection by the state of said such Pioneer Memorial Building on such leased ground.

The outstanding fact is that throughout the course of this legislation the intent appears to have been to lease to the Daughters the triangle described and to appropriate money to them to enable them to build a building thereon or for the state itself to build such Pioneer Memorial Building *for* the Daughters. I am inclined to the view of Mr. Justices Pratt and Latimer that the intent in 1945 was for the state to build the building. But throughout, the building was to be erected *for* the Daughters of the Utah Pioneers. One of the prime questions is whether under the evidence as it has been given to us piecemeal by stipulation, the building which when built would be for a public or a private purpose. Certainly the Daughters and not the State would virtually own it. Ninety-nine years is a long time in any man's life. And subject to a few general conditions required by the lease which Chapt. 106, Laws of Utah 1941, provided for, the state would seem to have little if any, control or supervision in regard to the "public purposes" for which the act of February 6th, 1941, Chapter 106, Laws of Utah 1941,

and amendments thereto purported to be passed. Furthermore, unless it can be said that the Daughters of the Utah Pioneers is itself a public institution or is engaged solely in a public enterprise the building was erected for all purposes for which it was organized and evidently is to be used for all and any of such purposes. Apparently, as stated by Mr. Justice PRATT, it was to be run and managed entirely by the Daughters without interference by the state or any of its agencies. I am not much concerned, as is Mr. Justice PRATT, that the Daughters may discriminate in their custody and display of relics between those owned or loaned to it and those owned by others and not loaned. Some agency must have that power to select. I do not see that in order to bring exhibition of historical articles and manuscripts within the purview of a public purpose it should require that everyone who thinks he has some relic which should be displayed to the public should have the right to display it. The matter of placing within the discretion of the Daughters the right to select the days and hours for display is an ingredient of the right which is apparently given to them entirely to manage the building and the display without interference. If a private agency were to manage and administer the display it would seem that there should be a right of supervision of the acts and actions and policy of that agency. That may be so in this case but the legislation providing for the lease and the erection of the memorial building specifies only a very few conditions to be placed in the lease. This gives me pause as to whether the Daughters are not given absolute discretion as to hours of display, management of the building, and supervision of the display of its contents. I think it may even be debatable whether the State Land Board has the authority to include conditions in the lease other than those laid down by the legislation, but I do not believe I will need to resolve that question.

Furthermore, in view of the plans of the building mentioned by Mr. Justice PRATT there may be a question as

to whether the building is primarily for the purposes of displaying relics or primarily for the social and private purposes of the Daughters, but I doubt if I need to resolve that question. In any event, I shall leave this subject for the time being in the state of suspended animation. I may return to it later when I come to a consideration of the question which I think really controls this case.

As I see this matter there are two closely related questions: First, is it within the authority of the legislature to lease to the Daughters for a period of 99 years, land which was dedicated for the use of the state for Capitol grounds and to build thereon *for* the Daughters a memorial building (a) assuming that the predominant and main purpose of the lease and erection was the housing and care of pioneer relics; or (b) assuming that it was principally to provide a hall for the Daughters and only incidentally for the housing and display of the relics. Second, assuming that the making of the lease provided for in Chapt. 106, Laws of Utah 1941, as amended by Chapt. 128, Laws of Utah 1948, and the building to be constructed thereon was within the authority of the legislature, and assuming that the Memorial Building is not to be built *for* the Daughters but for the State, does the designation of them as sole custodian, manager and administrator of the building, relics and the documents to be housed therein for display to the public, contravene any of the provisions of Sec. 4, Article I of the Constitution of Utah, reading, so far as material here, as follows:

"* * * There shall be no union of Church and State, nor shall any church dominate the State or interfere with its functions. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment. No property qualification shall be required of any person to vote, or hold office, except as provided in this Constitution."

I shall address myself to the second of these questions because if an appropriation for a building in which the Daughters are given sole control is unconstitutional cer-

tainly we need not answer the (a) and (b) arms of the first question.

In order to measure the appropriation for the Pioneer Memorial Building alongside of the above quoted Constitu tional Provision, I must first revert to certain facts, policies, and activities concerning the Church of Jesus Christ of Latter Day Saints (hereinafter for brevity designated as the Mormon Church) which are of common knowledge in this state. It is the dominant church in this state in members and influence. It is aggressively active in proselyting and crusading for its beliefs and for new members. It sends missionaries all over the world. This policy was apparent from the very advent into this valley. It was publicly proclaimed in the conference of 1849. A large portion of its members are not only earnest but intense in their belief in its teachings and creed, and are energetic in the spreading of them. And proselyting is, to put it mildly, encouraged by the Church. There is nothing wrong with this. People who intensely and earnestly believe that they possess truths that would be helpful to mankind may be actuated by an unselfish motive to share such beliefs with others and especially is the case where tolerance for the beliefs of others is retained. I am not aware of any place where so many of one dominant faith have in the latter years been so tolerant of the beliefs of others and where one can feel more comfortable in worshipping in another church than in the state of Utah. But we must recognize as a fact that propagation and dissemination of the Mormon faith are considered by the authorities of the Church and by a great many Mormons to be their privilege and their duty. I ask the reader to hold the above facts in mind while I pass on to consider the membership of the Daughters.

It is a fair inference that, since those of the Mormon faith greatly preponderated in the territory of Utah up to May 10, 1869, the descendants of those Mormon pioneers who now constitute the present membership of the Daughters greatly preponderate. While unfortunately we have no

figures regarding the number of members of the organization who are now Mormons or who are quite active in the Church, I think it can be assumed that the number is large and constitutes a decided majority; also, that among the leaders there are those who are avid in their espousal of church doctrines and work to disseminate its beliefs. It hence transpires that we have on the one hand a church which is aggressively engaged in the propagation and dissemination of Mormonism and which encourages, if it does not command, its members to do so; on the other hand, there exists the organization of the Daughters in regard to which it may be fairly inferred that there are many members *also members of the Church* who have these ideas as to their duty to propagate the doctrines and beliefs of the Church. While not a lay or clerical organization of the Church or organically or officially affiliated with it, the Daughters have the aspect as such because of the great degree of identity of membership and ideology. It constitutes at least an ideological connection which opens to the Daughters whose contact with the public through its display of relics and its sale to that public of pamphlets and souvenirs an opportunity, and perhaps even a temptation, to disseminate the doctrines of the Church. These pioneer relics, manuscripts and documents constitute not only the symbols and evidence of the heroic exploits of a pioneer society—there have been a number of that type of society— but at one and the same time the evidence of a religious and formerly a semi-theocratic society aggressively engaged in perpetuating its religion and increasing its membership. And that spirit and will to crusade for the dissemination of Mormon doctrines has persisted throughout the history of the Church and still persists. Many of the pamphlets now on display by the Daughters in the Capitol deal with the phases of early pioneer life, social and otherwise, its difficulties and its problems. A want of sufficient time has prevented me from reading their pamphlets, which are sold to the public, to ascertain whether they deal with Mormon theology, doctrines or beliefs. I must assume that they do

not since no evidence has been presented by the plaintiff that the pamphlets carry subtly or otherwise any attempt at religious propagation. However, the line which separates a dissertation on purely pioneer life, where one of the main ingredients of that pioneer life and the very purpose which brought it about was the pursuit and dissemination of religious life from a dissertation on religious dogma, may itself in many cases be a very thin one. These pioneer relics, historical manuscripts, documents and pamphlets constitute potential media for the propagation not only of the deeds and sturdy qualities of the pioneer founders but for their religious doctrines and creeds. Their potentialities as pabulum to further the doctrines and principles of Mormonism when under the uncontrolled supervision of those Daughters having an identity of ideological interest in the propagation of the doctrines of Mormonism need not be further labored. All this would be constitutionally unobjectionable if the taxpayers' money were not appropriated to enhance such opportunities and potentialities.

There is nothing wrong or improper in such Church members being also memebrs of the Daughters nor for that matter in engaging, if they care to do so, in some identical activities of members of two organizations. My thesis is that our constitutional provision which prohibits taxpayers' money from being appropriated or applied to religious institutions was passed in this state in the light of the history of this state; that it is against the spirit and perhaps the letter of that provision broadly construed to effectuate its purpose to appropriate land (a 99 year lease amounts to an appropriation of land for that period) and for the state to vote moneys for the erection of a structure to be turned over to an organization when the State retains little, if any, control of the activities carried on in said building and when this organization, while itself not a church, has many among its members and even among those in control of the organization, who have been steeped in the belief that

"verily, the sound must go forth from this place to all the world, and unto the uttermost parts of the earth." Doctrine and Covenants, 58:64, 65.

The opportunities, the potentialities, and perhaps the unconscious urge to use this structure and this leased land and these relics and certain historical and religious pamphlets to propagate their religious beliefs are not imaginary but real when we look down the vista of years through which this lease runs. At first we may expect great circumspection in this regard but over the years the influence of a Church, one of whose cornerstones is an aggressive crusade for proselyting and converting, always holds the likelihood that it will be expressed through the activities of members of the Daughters in that capacity, especially since their contact with the public as above pointed out is one which presents a constant opportunity for such propagandistic activities. If money appropriated for the collection and display of these symbols of an early religious culture were the only matter in issue I do not think Section 4 of Article I of our Constitution would prohibit such appropriation even though as a by-product it might result in an increase in the membership of the dominant Church.

What I have said above does not prevent the voting of public money for the collection, care and display of relics. This itself, as said at the beginning of this opinion, is a public purpose. Nor was anything said meant to prevent the Daughters, whose work over the years has resulted in preserving these valuable symbols of an early religious and theocratic culture, from continuing their fine work in this field. Presently it occurs to me that the State may (laying aside the question of the use of land which may have been specifically dedicated for Capitol grounds, a question I have not gone into) build the Memorial Building, and, were it not for one matter later to be considered, constitutionally use the Daughters as an agency to collect, preserve, and display the relics, manuscripts and documents in the building,

keeping control, however, of the building and its use through some over-supervisory agency.

This is not the case of placing in the hands of a veteran's group war relics or trophies and voting them funds to display or exhibit for patriotic or educational purposes such mementos of the critical times of our history or of the building of a memorial for their housing and display and turning it over to a veteran's organization to administer as an agency of the state. Such is the case of *Conley* v. *Daughters of the Republic of Texas*, (Tex. Civ. App.) 151 S. W. 877, relied upon by defendant. There, the State of Texas bought property formerly part of the Alamo Mission and delivered the same to the Daughters of the Republic of Texas, a private organization, for the purpose of honoring the men and women who had achieved the independence of Texas and of perpetuating their memories by preserving and displaying documents and relics. There was no religious phase involved in that case. Here we have a unique history. The pioneers were predominantly members of, and ardent believers in, Mormonism, a comparatively new religion on the face of the earth. The government partook of the nature of a theocracy. The history and culture was an interweaving of the secular and sectarian—the church and state. The relics and phyiscal symbols of that culture therefore assume a religious as well as a civil significance.

The great majority of the members of the Daughters are descendants of those pioneer Mormons and at the same time members of the aggressively proselyting Mormon Church. This combination of circumstances furnishes such potentialities and opportunities for the use of a Pioneer Memorial Building and the relics and documents to be kept and exhibited there for the propagation of particular religious doctrines and beliefs when under the sole control of the Daughters as to make any appropriation for its construction and maintenance under such circumstances an appropriation for religious instruction.

So far, I have purposely discussed this phase of the case without resort to the purposes of the organization set out in their Constitution. But I have done so as a background to what I consider the most critical point before us. An examination of those purposes not only adds greatly to the conclusion set out above, but seems to me to rule out the Daughters as the agency to display these relics and historical data to the public. One of those objects of the organization, as set forth in its constitution, is

"to perpetuate the names and achievements of the men and women who were the pioneers in founding this commonwealth; * * * *by seeking to promote and carry out the objects and purposes which the pioneers had in view when they sacrificed all they possessed and turned their faces to the West to seek homes in these mountains."* (Italics added.)

I have before called attention to the fact that the main if not the only objectives the Mormon pioneers had in leaving Missouri and coming to the territory of Utah was to preach, practice and propagate the Mormon religion.

I do not think that the Daughters had in mind when they worked to secure the lease on the triangle and the appropriation for the Memorial Building any idea of capitalizing on their control of the relics and the building for propagation of religious beliefs. But I think the "set-up" is so fraught with potentialities and opportunity for propagation of the Mormon religion that it falls within the prohibition of Section 4, Article I of our Constitution. The time to prevent the fruition of the potentialities of this situation is now—at the threshold. I think our Constitution meant to prohibit the appropriation of moneys not only for religious exercise, instruction or worship but also to prohibit the appropriation for the purpose of bringing into existence a "set-up" so highly fraught with potentialities, opportunities and temptations for the propagation of one religious faith in contradiction to competing faiths.

It is suggested that Section 4, Article I of our Constitution is an implied condition of the legislative enactment and

the lease made pursuant thereto and "that it must be read into the law and the lease in order to sustain the provisions of one and the terms of the other." But our Constitution does not bid us to stand guard to see whether over a long period of years an organization, one of whose avowed objectives is to promote the "purposes which the pioneers had in view," commits overt acts in furtherance of its purpose and then appeal to some future legislature to cancel the lease because of a breach of an implied condition. We should know that evidences of propagation of a faith under circumstances above described are most difficult to ferret out unless they are so flagrantly and so extensively indulged in as to become notorious. If there would be proselyting it would be more likely to be subtly rather than boldly carried on, especially if it were realized that it might be made the basis for an attempt to have the legislature cancel the lease. It is enough to make applicable the prohibition of Section 4 of Article I that public money is to be voted and public property to be applied to a building which is for the use of an organization whose expressed purpose is to promote the purposes "which the pioneers had in view" when we are apprised that one of these purposes was the propagation of the Mormon faith. To await the proof of overt acts showing active work in the furtherance of this expressed objective is equivalent to leaving open the stable door to see if the horse disappears. If I may be granted the use of a mixed metaphor our Constitution requires that we close the stable door to the appropriation and application of public moneys and property to the use of any organization whose expressed object, whether latent or active, is to propagate a definite religious faith. I do not think we would sanction a lease to a church or the appropriation of public moneys to build a structure for the church to house relics and manuscripts connected with its earlier religious life when its express purpose was to propagate its religious doctrines. By the same token I cannot see why we should sanction such appropriation and grant of property to an organization not a

church but one of whose expressed purposes was to further the doctrines of a specific church.

It was early recognized that institutionalized religion deals with man's relation to God and man's life hereafter; that these matters are of the gravest and most serious concern of man as they deal with his eternal welfare; that there are many sects and many religious and ecclesiastical organizations each convinced that it possesses the true concepts of this relation to God, and its implications, and what is necessary to attain everlasting life; that these have their effects on the emotions of men and unless the field is left free for the development and expression of these emotions without aid or interference by the state and the preference of one sect over others which such state aid or interference would bring about, institutionalized religion will be divisive of our citizenry far more than it is today. The experience in other continents bears this out. Consequently, there has generally been a zealousness in guarding this policy on the part of the highest court in our land as well as by the courts of the states.

To resolve any doubt in favor of constitutionality it is not necessary that we resolve every bit of evidence which may have two or more interpretations in such a manner as to bring about a conclusion of constitutionality. The various segments of evidence should each be examined so as to deduce from them their most reasonable inferences and these portions of evidence must also be examined in the light of each other. When this process is carried out and there results a conviction that the appropriation would produce a situation against which our Constitution meant to guard in this very sensitive and controversial field wherein religious worship and religious ideas and beliefs touch and compete with each other we must declare the appropriation as prohibited by our Constitution.

Because of the length of this opinion and for the purpose of summing up and tying together the propositions in which my conclusions rest, I recapitulate these propositions:

1. The Mormons came to Utah in 1847 for the purpose of gaining for *themselves* the right to worship *their* faith without interference or prosecution and of propagating this faith.

2. That very early the policy of vigorous propagation of their faith was officially adopted and that has been continuously and effectually carried on ever since.

3. The Daughters of the Utah Pioneers has no official connection with the Mormon Church but the great majority of its members are Mormons and many of these, and especially the leaders, may be deemed to believe in the Church policy of vigorous propagation of the Mormon faith and the conversion of new members to the Church.

4. The Constitution of the Daughters expressly states that one of its purposes is "to promote and carry out the objects and purposes which the pioneers had in view" when they came to Utah, one of which purposes was to propagate and proselyte the Mormon faith.

5. The Daughters is given a 99 year lease which is an appropriation of public property to it. There is also appropriated a large sum of money for the building of a Memorial Building *on the leased land* for the housing and care of pioneer relics, manuscripts, and historical documents, which building and its contents are to be under the immediate control and management of the Daughters, and are to be on display for the public.

6. That the nature of the exhibits, being of a pioneer socio-religious culture present the temptation to proselyte and the potentialities for proselyting, since the display is under the supervision of a group, many of which we may fairly infer are imbued with the missionary spirit and desire to propagate the Mormon faith.

7. That this urge will be all the stronger in light of the fact that one of the purposes of the Daughter's as expressed clearly in the Constitution of their organization is to "pro-

mote and carry out the objects and purposes which the pioneers had in view," when they came to Utah, and one of which purposes of the pioneers was propagation of the Mormon faith over the earth.

8. That under this situation the leasing of public land and appropriation of public money and property for a building to house the relics on property leased to the Daughters thus giving them control and supervision of the contents and charge of the display, places in their hands the intrumentalities for carrying out one of the expressed purposes of their constitution and a purpose which many of them by reason of their being ardent Mormons might be tempted to carry on; and

9. Thus the appropriation and lease is an appropriation and application to a religious instruction as is prohibited by Section 4, Article I or our Constitution and is therefore unconstitutional.

For the reasons herein given, I concur with the result of the opinion of Mr. Justice PRATT.